Hillsborough,
No. 5177.

FLORENCE GILLIAM *v.* WALTSONS CORPORATION.

Argued April 7, 1964.
Decided June 2, 1964.

*Craig & Craig* and *McLane, Carleton, Graf, Greene & Brown* (*Mr. Stanley M. Brown* orally), for the plaintiff.

*Wyman, Bean & Tefft (Mr. Stanton E. Tefft* orally), for the defendant Waltsons Corporation.

WHEELER, J. The chief contention of the defendant is that the plaintiff testified under oath to intentional misstatements of material facts, that her testimony under oath as to the details of her prior medical history, the accident and her medical history since the accident is unworthy of belief as a matter of law and that the Court should consequently have granted a directed verdict for the defendant. *Hebert* v. *Railroad*, 90 N. H. 324; *Laporte* v. *Houle*, 90 N. H. 50; *Moreau* v. *Insurance Co.*, 84 N. H. 422; *Amoskeag Trust Co.* v. *Insurance Co.*, 88 N. H. 154.

The plaintiff's medical history prior to the accident in question has been long and varied. She has had ten children and four miscarriages. In 1940 in Maine she had a hysterectomy. In 1949 she first noticed a hernia after a fall.

Between 1950 and 1953 she received various treatments for heart condition, back pains and varicose veins. Between 1954 and 1956 she was treated for a post-operative hernia, varicose veins and high blood pressure. She was furnished with a corset support, and with elastic stockings for her varicose veins.

On December 17, 1956 she was again treated in a hospital for hernia, extensive varicose veins and varicose ulcer and was discharged from the hospital on January 16, 1957 following which she went to the county home for recuperation from the hospitalization. On February 14, 1957 she was fitted with a surgical garment for her hernia. Between March 5, 1957 and January 31, 1958 there were five visits to doctors, among the complaints being severe abdominal pain in the upper right quadrant. From January 21, 1958 to April 9, 1958 she was treated as an outpatient at the Elliot Clinic for pains in the spine, high blood pressure, overweight, heart and hernia.

Following the fall on February 14, 1959, which resulted in the instant case, there were various medical treatments for complaints of blackouts and back pains. In June 1959 the plaintiff again entered the hospital and received operative treatment for hernia. On September 17, 1959 the hernia was again repaired due to a strain in lifting her daughter's child. The defendant claims that between 1960 and 1962 the plaintiff fell on several occasions.

The defendant Waltsons Corporation owns a shopping center

in East Manchester. In the summer of 1956 the construction of a row of stores was commenced by Davison Construction Co., Inc., of which F. W. Woolworth Co., Inc., lessee of defendant Waltsons, is the last on the easterly end of the stores.

In front of these stores is a concrete walkway 12 feet in width covered by a canopy which runs the whole length of the buildings. This sidewalk was not carried to the end of Woolworth's store but ended about 3 to 4 feet short of the end of the building. Since further leases could not be arranged further construction easterly or southerly of Woolworth was not immediately contemplated.

Embedded in the 6-inch slab of concrete of the sidewalk about 4 1/2 inches below the surface but extending 18 to 24 inches beyond the end of the sidewalk was a wire mesh reinforcement welded in 6-inch squares. The protruding end of this reinforcement was covered by gravel at the time the sidewalk was poured in 1956 and was never corrected until the defendant Waltsons did so after the accident. The contractor Davison was aware of this condition but was not informed that there was to be no further extending of the sidewalk.

It is conceded by the defendant that on the day of the accident the plaintiff was a business invitee of both Woolworth and Waltsons. The plaintiff, sixty years of age, was driven to the shopping center by her employer. Arriving there, he parked his car at the east end of Woolworth's store. Mrs. Gilliam left the car and approached the sidewalk from the east. As she neared the easterly end of the sidewalk she caught her foot in the protruding wire mesh and fell heavily onto the sidewalk. A witness to the accident testified, "Well, she just simply went down like a brick. It's a wonder to me she hadn't stove her face in the way she went down."

In addition to the many discrepancies claimed by defendant in the deposition of the plaintiff taken prior to trial as to her numerous visits to doctors and hospitals for various medical treatments before and after the accident, the defendant cites numerous other examples of her testimony during the trial as making her entire testimony entirely unworthy of belief.

These discrepancies among others, consist generally of a failure to recall, or a denial of the numerous times and types of treatment she had received from a number of doctors over many years, the various treatments in hospitals and as an outpatient.

Defendant's council further argues that her testimony on the stand that the accident occurred on February 14 which is at variance with a doctor's record that it occurred January 24, is a further illustration of an intent to fabricate her entire case. There was evidence from Woolworth's manager and others that the fall occurred on February fourteenth. At the pre-trial hearing counsel had agreed that the accident happened on the fifteenth. Since the date of the accident was not really in doubt defendant's contention is of little aid in determining the truth or falsity of her testimony. The defendant relying upon *Laplante* v. *Rousseau*, 91 N. H. 330, 331 and *Hebert* v. *Railroad*, 90 N. H. 324 argues with much force that these and other discrepancies in her testimony make the plaintiff entirely unworthy of belief and that this is an exception to the rule that only in clear cases may this court say as a matter of law that the testimony is entirely unworthy of belief.

It is true that there were numerous contradictions in the plaintiff's testimony when confronted with the records of her many medical treatments, and at other times there were inconsistent statements and an unusual lack of memory concerning the same. However we cannot say that it was a clear case of falsehood when consideration is given to her some twenty-five years of hospitalization and medical treatment. Consideration must also be given to the fact that the plaintiff was an apparently uneducated woman who evidently had had less than the ordinary opportunities of life.

The jury had the opportunity to hear and observe the plaintiff's testimony while this court did not. It is well recognized that a witness's appearance on the stand may have carried a conviction of sincerity which "precluded a finding that she deliberately falsified her testimony." *Wilson* v. *Bank*, 95 N. H. 113, 116. The Court likewise had the opportunity to observe the witness and evaluate the trustworthiness of her testimony. Weight must be given to its denial of defendant's motion to set aside the verdict on the ground, among others, "that the testimony of the plaintiff was unworthy of belief as a matter of law."

"While credibility may become a matter of law . . . it is only in clear cases that the court has seen fit to apply this doctrine . . . such as in situations where the testimony was contrary to undisputable physical facts." *Lampesis* v. *Comolli*, 101 N. H. 279, 283; *Romano* v. *Company*, 95 N. H. 404, 406, 407, and

cases cited. Considering all the facts surrounding the plaintiff's medical history we cannot say that her testimony was unworthy of belief as a matter of law. The evidence in support of the plaintiff's case, in addition to the plaintiff's testimony, warranted the denial of the defendant's motion for a directed verdict.

The defendant further contends that the Court erred in permitting the issue of permanent injury to go to the jury and likewise in not granting a new trial on the ground that the verdict was excessive and that the jury was influenced by passion, prejudice and mistake.

There was evidence from which the jury could find that permanent injury was caused by the accident. Dr. Maher in answer to a hypothetical question as to what probably happened to the pre-existing ventral hernia as a result of the fall on February 14, 1959 testified as follows: "With the history of a woman falling, a woman of her size, on a hard surface—your first impulse, you try to save yourself, you tighten up. Then she landed with force on her abdomen. The contents of the abdomen were compressed. They were forced into the only opening which is available, and in her case the incisional hernia. Above that they have the diaphragm, the ribs, which are a solid structure. We know she did not get any hiatus hernia to any degree, did not show up in the x-rays. So it is my opinion that the fall caused that hernia to be incarcerated and was not reducible. When I saw the patient it was still caught within the hernia sac. Q. On that basis, Doctor, is it medically true that the subsequent operative procedures which you testified about, including the preoperative work on the legs, your own operation, the second repair of the first one, the reduction of the infection, the drainage problem, all of those were the result of the incarceration of the hernia? . . . A. Yes, sir."

The doctor further testified that as a result of the incarceration and the operative procedures the plaintiff would not have the capacity to engage in heavy work for the rest of her life, that she would not be able to return to her previous occupation as a domestic, or to any heavy work or heavy lifting because of abdominal pain; and that such type of work would probably cause a recurrence of the hernia.

In this state of the evidence the jury could properly find that the plaintiff received permanent injury as a result of the accident in question.

At the time of the trial the plaintiff was sixty years of age with average future life expectancy of 19.2 years. There was evidence from which the jury could find that prior to the accident she had an earning capacity of $35 per week as a practical nurse, and of $15 to $20 per week plus maintenance while doing housework.

At the time of the accident and during part of 1957 and 1958 she was engaged as a housekeeper and cared for two retarded children. For this work she was supposed to get $15 per week but was later cut down to $15 per month plus her room and board. There were special damages of $2,662.55 and four years of pain and suffering from the date of the accident to the time of trial.

In computing her loss of earning capacity the jury was entitled to use its common knowledge and experience in determining the value of her maintenance in connection with her earning capacity prior to the accident, which was as they have found permanently and totally destroyed thereby. Applying their knowledge of her earning capacity prior to the accident together with the value of her room and board and the fact that this could be calculated over a period of twenty-three years (nineteen years life expectancy at the time of the trial plus four years from the date of the accident) we cannot say that the verdict of $22,000 was excessive as a matter of law.

During the course of the trial counsel for defendant Waltsons objected to the receipt in evidence of a contract between Waltsons and Davison with respect to the section which limited to one year after completion Davison's liability for structural defects in the sidewalk adjacent to Woolworth. The Court instructed the jury that they might take into consideration that Waltsons had a right to assume that the Davison Company would complete the job in accordance with the specifications unless and until the ordinary man of average prudence would not make such an assumption. The jury were further instructed to "consider all of the material evidence, including the contract between Waltsons and Davison and the lease from Waltsons to Woolworth. However, even though the contract and lease are factors for you to consider together with the other evidence in determining whether or not Waltsons has fulfilled its duty, neither the contract nor the lease would change that duty which was a duty to use reasonable care to keep the premises reasonably safe." These

instructions correctly stated the rule in *Russell* v. *Whitcomb*, 100 N. H. 171 and it is presumed that the jury considered this evidence in accordance with the instructions.

The order therefore is

*Exceptions overruled.*

All concurred.