Belknap
No. 6733

STATE OF NEW HAMPSHIRE

v.

RONALD G. FLEURY

May 31, 1974

*Warren B. Rudman,* attorney general, and *Gregory H. Smith,* attorney (*Mr. Smith* orally), for the State.

*Nighswander, Lord, Martin & KillKelley (Mr. David J. KillKelley* orally) for the defendant.

DUNCAN, J. Two indictments returned on January 29, 1973, by the grand jury for Belknap County charge the defendant with the offense of first-degree murder. In advance of trial, the Superior Court *(Batchelder,* J.) transferred to this court the questions of law presented by the defendant's exception to the denial of his motion to dismiss on the ground that the grand jurors were improperly selected.

More specifically, the defendant's motion constituted a challenge to the array or panel of jurors from which the grand jurors were drawn, there being no claim of impropriety in the method by which the jurors who returned the indictments were drawn from the panel. The panel consisted of 648 potential jurors selected by the selectmen of the ten towns and six city wards of the county. The grand jury as finally constituted consisted of twenty-three jurors including seven women drawn from the panel by lot by the clerk of court in proportions determined by computer for a ten-year span from 1972 through 1981. Under the formula so determined, the grand jury in question included no juror from either Barnstead or Center Harbor. Twenty-one jurors, consisting of five women and sixteen men, actually served.

The defendant contends that the statute providing for the selection of the panel (RSA 500-A:2 (Supp. 1973)) is unconstitutionally vague; that his constitutional rights to due process and equal protection, guaranteed by both State and Federal Constitutions, have been infringed; and that his right to a properly constituted grand jury has been denied by reason of material violations of RSA ch. 500-A (Supp. 1973).

The controlling principles governing the selection of a jury panel were considered by the court in *State v. Thomson,* 109

N.H. 205, 247 A.2d 179 (1968), *cert. denied,* 394 U.S. 903 (1969). We there pointed out that the officials charged with the selection of a jury panel "bear a heavy responsibility . . . to ensure that the panel of jurors will consist of a selection made at random, from representative sources of persons reflecting a normal cross section of the population involved who are capable of performing competently the responsibilities of a juror. *Brown v. Allen,* 344 U.S. 443, 473; *Witherspoon v. Illinois,* 391 U.S. 510; *People v. Henry,* 284 N.Y.S.2d (Cty. Ct.) 726, 730."

Insofar as federal constitutional rights are involved, the United States Supreme Court has said: "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross section of the population suitable in character and intelligence for that civic duty." *Carter v. Jury Comm'n,* 396 U.S. 320 (1970); *see Brown v. Allen,* 344 U.S. 443, 473 (1953).

A careful review of the record in this case leads us to the conclusion that the process employed in selecting the grand jury which returned the indictments in question did not violate the principles set forth in *State v. Thomson* or depart from the requirements of the applicable statute in any material or substantial way.

It must be noted at the outset, that selection of the grand jury in question was governed by new statutory provisions, enacted since *State v. Thomson* was decided. RSA ch. 500-A (Supp. 1973); Laws 1971, 456:10 (eff. January 1, 1972). Under the former statute the selectmen were directed to prepare a list "of such men and women as they judge *best qualified* to serve as jurors". (Emphasis added.) They are directed by the present statute to prepare a list of such men and women "as they judge *eligible* to serve as jurors." (Emphasis added.) RSA 500-A:2 (Supp. 1973). The new statute contains a more restricted list of exemptions than formerly (§ 4) and further provides that persons who have served as jurors "shall not have their names again placed on the list for six years". § 10; *cf.* RSA 500:15 (two years).

The specific statutory violations which the defendant alleges to have occurred are (1) that one of the two jurors

from Meredith had served as a juror in 1968; (2) that women having the care of children under twelve years of age were purposely and systematically excluded from jury duty; (3) that potential jurors between the ages of eighteen and twenty-one were similarly excluded; and (4) that by exceeding the discretion conferred upon them, the selectmen produced a panel which discriminated against potential jurors from "lower economic groups", nonhome owners, and recent residents.

At the hearing upon his motion, the defendant produced extended analyses comparing the composition of 570 of the panel of 648 prospective jurors with 1970 census-derived figures of the composition of the county, to demonstrate inconsistencies in various categories. Additionally the defendant called as witnesses a selectman from each of the sixteen towns and wards of the county to testify as to the method followed in each case in selecting prospective jurors for the panel.

The defendant is a twenty-four-year-old roofer from Massachusetts described by his counsel at the hearing as single, "of a lower economic group", the "type that has long hair", with a tenth-grade education, but having a high school equivalency test certificate. It is his contention, in essence, that the panel as finally constituted was not a random selection of prospective jurors representative of a normal cross section of the community, and that he has thereby been denied his constitutional right not to be "deprived of his property, immunities or privileges . . . or . . . of his life, liberty, or estate, but by the judgment of his peers . . . ." N.H. Const. pt. 1, art. 15.

A careful review of the record satisfies us that the evidence did not require adoption of the defendant's contentions. The method followed by each town and ward was described by the witnesses before the trial court. In all but one instance, the voter registration list was used as a point of departure. The exception was that in Meredith the list of all resident taxpayers was used. In each town and ward but one, the list was reviewed by the selectmen to select prospective jurors, and the testimony uniformly indicated that the selectmen had personal knowledge of most of the voters or taxpayers

upon the lists. In the town of Tilton, the process of selection from the voter list was a purely mathematical one of selecting every thirty-third name, unless such a person were found for some reason known to the selectmen to be ineligible. In the remaining towns and wards, the process consisted of perusing the list, and selecting the names of eligible persons until a sufficient number had been reached to satisfy the quota requested by the clerk of court.

Admittedly, one of the grand jurors who returned the indictments had served upon a Belknap County jury within six years of his selection for this grand jury. The applicable statutory provision directed that persons who had so served "shall not have their names again placed on the list for six years". RSA 500-A:10 (Supp. 1973). This is a directory provision, creating no personal disqualification but obviously designed to minimize the individual's burden of jury duty, rather than to further the selection of qualified and impartial jurors. An inadvertent failure of compliance cannot be held to vitiate the indictments. *State v. Forshner*, 43 N.H. 89 (1861); *see State v. Goyet*, 119 Vt. 167, 22 A.2d 862 (1956).

It appeared that in two towns (Barnstead and Center Harbor) from which no grand jurors were drawn, and in two other towns which did furnish grand jurors (Gilmanton and Gilford), it was the practice to exclude young mothers or young housewives, while in two Laconia wards (2 and 5) women with small children, and in Alton, women with large families, would also be passed over. In other towns such as Belmont, Meredith, New Hampton, Tilton, Sanbornville, and Laconia Ward 1, no women were excluded from selection. In instances in which exclusion may have taken place, it could be found to have resulted either from an attempt to avoid selection of women likely to be excused for reasons of hardship, or by reason of the statutory provision that "any woman who has care of one, or more children under the age of twelve years shall, if she so desires be exempt from jury duty." RSA 500-A:2 (Supp. 1973); RSA 500:1. In any event, the record contains no evidence indicating how many names of women with young children appeared upon the source lists, and no evidence that any significant number was excluded in the selection of the jury panel in question.

Selection of the names for the panel of jurors was presumably made in May 1972. RSA 500-A:2 (Supp. 1973). The twenty-sixth amendment to the Constitution of the United States, effective in July 1971, extended the right to vote to citizens eighteen years of age or older. RSA, Const. of the United States, Am. XXVI (Supp. 1973); *see* Laws 1971, 298:1, Laws 1971, 547:1. To what extent inhabitants of Belknap County between the ages of eighteen and twenty-one thereafter registered to vote before May 1972 does not appear from the record, but only 4 out of 570 potential jurors who replied to questionnaires fell in the 18 to 24 age group. However, it is established law that voter lists, even though lacking any substantial number of younger people, may properly be utilized in the selection of prospective jurors without violation of constitutional precepts. *United States v. Hamling*, 481 F.2d 307, 313-14 (9th Cir. 1973); *United States v. Gast*, 457 F.2d 141 (7th Cir. 1972); *United States v. Kuhn*, 441 F.2d 179 (5th Cir. 1971); *see* ABA Standards Relating to Trial by Jury 51 (Approved Draft 1968); Report of the Judicial Conference Committee, 42 F.R.D. 353, 360, 361 (1967); *cf.* Comments, 52 Ore. L. Rev. 482 (1973); 59 Iowa L. Rev. 401 (1973).

The defendant contends that an examination of the questionnaires of jurors who had served on juries of the county in the previous five years would admit of a finding that few of them came from "lower economic groups", that few of them were persons who did not own their homes and that few of them were recent residents. However the record does not purport to show any intentional or purposeful exclusion of such persons from the jury panels selected in those years, and falls short of showing it for the year in which the panel in this case was selected.

The law is well settled that the list from which prospective jurors are selected need not be a statistical mirror of the community. *Swain v. Alabama*, 380 U.S. 202 (1965); *Hoyt v. Florida*, 368 U.S. 57 (1961); *Hernandez v. Texas*, 347 U.S. 475 (1954); *see United States v. DiTommaso*, 405 F.2d 385 (4th Cir. 1968). Similarly less than a proportional representation of some categories of the populace is not fatal where not clearly shown to result from purposeful and systematic exclusion of groups which are "cognizable" as a distinct class. *United*

*States v. Gast,* 457 F.2d 141 (7th Cir. 1972). No purposeful and systematic exclusion is shown by the testimony in this case.

Nor did the testimony indicate any uncertainty on the part of the selectmen as to what qualifications of prospective jurors were wanted in order that they should be "eligible to serve". RSA 500-A:2 (Supp. 1973). In general, choice depended principally upon availability, physical ability, and mental competence. The process of selection consisted primarily of rejecting those thought to be disqualified, rather than of selection based upon any detailed consideration of the individual's qualifications. So far as particular qualities were sought, they compared favorably with those prescribed by statutes of other jurisdictions elaborating upon specific attributes (*see Carter v. Jury Comm'n,* 396 U.S. 320, 333 & n.31, 334 & n.32, 335 (1970)), namely, those of integrity, character, competence, and responsibility.

Since the days of the Magna Carta the requisite qualifications of jurors have become imbedded in the jury system so as to be commonly known and understood (*Glasser v. United States,* 315 U.S. 60, 84-85 (1942)); and the requirement of impartiality is enshrined in the sixth amendment to the United States Constitution and in articles 17, 21 and 35 of our own Bill of Rights. N.H. CONST. pt. I, arts. 17, 21, 35. We are aware of no justification for applying void for vagueness principles to jury selection statutes, where broad discretion has traditionally been accorded. Hence we hold that RSA ch. 500-A (Supp. 1973) is not invalid because it is vague and without standards governing selection. "It has been consistently held that a jury is not rendered unconstitutionally invalid by failure of the statute to set forth any standards for selection." *Fay v. New York,* 332 U.S. 261, 272 (1947); *see Swain v. Alabama,* 380 U.S. 202 (1965).

The defendant's argument that he was denied due process cannot be accepted. He relies in part upon N.H. CONST. pt. I, article 15 entitling him to the protection of "the judgment of his peers [and] the law of the land". It is settled law that due process thus required does not encompass the standards of jury selection which are peculiar to the federal system (*Fay v. New York,* 332 U.S. 261, 287 (1947)), but more properly

is confined to assurance of the jurors' impartiality and their indifference to the outcome of the case. *See Witherspoon v. Illinois*, 391 U.S. 510 (1968); *People v. Prior*, 294 N.Y. 405, 63 N.E.2d 8 (1945).

Similarly, equal protection of the law under the Federal Constitution requires that trial shall be by impartial jurors, but does not impose upon state systems those requirements of the federal system which embody "notions of good policy over and above the constitutional requirements of equal protection". *United States v. Butera*, 420 F.2d 564, 568 (1st Cir. 1970); *see* 28 U.S.C.A. § 1862 (1968).

It is settled that jury selection, to be constitutional, must be made from a "fair cross section of the community"; that voter lists adequately furnish such a source; and that random selection from the source need not be mathematically precise, or produce a statistical mirror of the population providing proportional representation of all categories of people in the community.

We find no compelling evidence that cognizable categories of potential jurors were systematically or deliberately excluded from this jury panel, and the trial court's denial of the defendant's motion is sustained.

*Exception overruled.*

All concurred.

On Motion for Rehearing. After the foregoing opinion was filed, the defendant moved for a rehearing.

*Nighswander, Lord, Martin & KillKelly* for the motion.

Duncan, J. In support of his motion the defendant points out that his contention with respect to exclusion of women from the jury panel was not confined to women with young children, but was directed to the exclusion of women generally. The record however failed to show that there was any such exclusion of a deliberate nature. On the contrary, the testimony indicated that there was not, and that there were some conscious efforts to see that women were included in the names submitted to the clerk of court.

Similarly the defendant asserts that he did not complain of exclusion of potential jurors in the 18-21 age bracket, but rather of the disproportion of those in the ages between 18 and 34. Obviously those 18-21 were included in the latter group. More significantly, it is also obvious that disproportion in the comparison of a population group in a 15-24 bracket with potential jurors in an 18-24 bracket is inconclusive, particularly since the absence of those aged 18-21 in the latter group is explainable and the number of persons age 15-18 in the population figure is unknown. A comparison of one group of ages 15-24 with another consisting mainly of ages 21-24 is bound to produce disproportion.

Comparison of the statistics in the age brackets 25 to 34 showed disproportion, but absent evidence of the numbers in this age group appearing on the voters lists, the comparison lacked probative force. Comparison of age brackets 35-44 showed a close relationship. Here both population and potential juror figures fell in a 15-16 percent proportion of the total. A shortage of persons ages 18-34 in the voter lists could account for the larger proportion of potential jurors over 44 as compared with population figures for persons over 44.

In the light of the inconclusive effect of the statistical evidence, we reaffirm our conclusion that the record failed to establish systematic or deliberate exclusion of cognizable groups of potential jurors.

*Motion denied; former result affirmed.*

June 28, 1974