Merrimack
No. 6783

### State of New Hampshire

v.

### Robert G. Breest

December 17, 1976

*Warren B. Rudman,* attorney general, *Thomas D. Rath,* assistant attorney general, and *Richard B. McNamara,* attorney *(Mr. Rath* and *Mr. McNamara* orally), for the State.

*Richard W. Leonard, Jon Asgeirrson* (of Massachusetts) and *Paul C. Semple (Mr. Semple* orally) for the defendant.

Robert G. Breest, by brief, pro se.

LAMPRON, J.   Indictment under RSA 585:1 (now RSA 630:1-a) for murder in the first degree of Susan Randall on February 28, 1971, at Concord. Trial by jury before *Keller,* C.J., resulted in a verdict of guilty. Defendant's exceptions to rulings of the court before, during and after the trial were reserved and transferred. The constitutionality of RSA 607:41-b to d (Laws 1972, 22:2), now RSA 651:45-b to d has been transferred without a ruling.

### I. MOTIONS FOR DISMISSAL AND FOR DIRECTED VERDICT

The State presented the following evidence. During the afternoon of March 2, 1971, an employee of the State highway department while repairing a bridge over the Merrimack River on Interstate Route 93 just north of Concord saw a body lying on the ice below. It was resting face down, clothed from the waist up only. A coat was also observed on the ice in the general area of the body. A State trooper who recovered the body testified that the deceased was 20 to 25 feet away from the bridge. The body was identified as that of 19-year-old Susan Randall of Manchester who had been reported missing since the previous Saturday night,

February 27, 1971. Items recovered from the scene were identified by her mother as belonging to Susan.

An autopsy was performed in the evening of March 2 by Doctor George C. Katsas, a board certified forensic pathologist. He described the exterior of the body as a virtual sea of bruises which had been received as a result of multiple trauma. The facial and neck area was covered with abrasions, contusions and lacerations. There were two distinct lacerations above and below the left eye, constriction of the neck, a severe wound inside the lip, and multiple bruises about the chest and back.

The internal examination by Dr. Katsas revealed that the body had suffered massive injuries to the vital organs. There was injury to the surface of the brain, compression of the chest with fracture of the sternum, severe bruising of the lungs, the liver was almost split in two, and there were also multiple ruptures of the duodenum. Dr. Katsas also testified that the abdominal injuries to the liver and duodenum were relatively "rare" and are most often caused by kicking in the abdominal area. In his opinion, death was caused "as a result of multiple, blunt injuries with ruptures of the liver and fracture of the skull." While some of the injuries could have been caused by falling from a bridge onto the ice below, Dr. Katsas testified that in light of the extensive covering of the body with injuries and the injuries to the abdomen it was his opinion that they were inflicted on the victim by a terrible beating.

The doctor testified that Susan had been killed "within a few hours after her last meal". There was evidence that this took place in the late evening of February 27. What turned out to be Susan's body had been observed on the ice where it was found by a witness riding in a bus at about 7:30 a.m., February 28, 1971. The doctor gave as his opinon at the end of the autopsy "that the appearance of the clothing, the partially undressed body thrown over the bridge, or found on the ice beneath the bridge together with multiple injuries indicated in multiple parts . . . on the body, . . . indicate a sexual angle."

Susan Randall who graduated from West High School in Manchester in 1970, had two jobs at this time hoping to save enough money to attend a fashion design school. On the Saturday evening of February 27, 1971, Susan had invited a friend, Judy Jenkins, to visit her new apartment on Manchester Street in Manchester. Judy arrived at about 9:30 p.m. The two visited for a time and then decided to walk to a nearby pizza restaurant for a snack and

made plans to attend an auction the next day. Susan was dressed in blue jeans, a sweater, and a hip-length brown fur coat and wore a brown floppy hat. They left the restaurant between 11:30 and 11:45 p.m. and walked south on Elm Street to Granite Street, then westerly toward Granite Square. Having gone through the Square, the two girls headed south on Main Street to the Squog Fruit Store where Judy was to meet her father for a ride home. They arrived there at about the time of the store's midnight closing. Judy remained at the store and Susan walked back north on Main Street toward Granite Street.

A witness testified that shortly after midnight that evening she drove through Granite Square and observed a young girl hitchhiking in an easterly direction in front of the Chicken House Restaurant. The girl was wearing "a floppy hat . . . and dark coat and slacks." This restaurant is located in the Granite Square area just around the corner from the Squog Fruit Store. On her way back home at approximately 12:30 a.m. this witness drove past the same location and the girl who had been hitchhiking was gone.

At about that time four people were sitting in the Chicken House Restaurant and saw a girl hitchhiking a ride east on Granite Street. One of them described the girl as wearing "a floppy hat, brown hat, and a fur coat down to her knees. And I don't remember if she had blue jeans or dungarees or black slacks or blue. But she had a pair of dark pants on." While watching the girl these people saw a white car with blue interior upholstery come by, stop, and this girl enter the vehicle. This car was driven by a "big man, I'd say around six feet tall, very broad shoulders, a big head for a man his size." At the trial one of these witnesses described the driver as having a "build consistent with that of the defendant."

Several witnesses placed the defendant Breest in the Granite Square area on the night of February 27 and the early morning hours of February 28. At about 5:30 or 6:00 p.m. on the 27th at the Haggett (Longval) residence located near Granite Square he enlisted the help of two young men to assist him move furniture from his former apartment in Manchester to his residence in Lowell, Massachusetts. It could be found that he left the back seat of his white 1964 Ford with blue upholstery at the Haggett house. After loading the car the defendant dropped off his helpers and headed out of Manchester. Breest arrived at his Lowell residence at about 10:30 p.m. He asked one Morel, an occupant of the building to help take in the larger pieces of furniture. Morel

noticed that the back seat in Breest's car was missing. The defendant told him he was returning to Manchester to get more furniture. Morel saw Breest leave again after 11:00 p.m. driving toward the road to New Hampshire but did not see him come back. Morel saw the Breest car parked in the street the next day and noticed that the back seat was in the car.

There was evidence that Breest returned to the Haggett residence at approximately 11:45 p.m. that same evening of February 27. After he talked to her son, Mrs. Haggett asked Breest to leave. She watched his departure from a window in her apartment overlooking her driveway where Breest's white car was parked. She observed him retrieve something from her porch and throw it in the back of his car. Mrs. Haggett testified that she saw the defendant drive away at about 12:10 a.m. February 28 in the direction of Granite Square.

A search warrant was obtained on April 2, 1971, and certain fibers and paint chips were removed from defendant's car. These were examined under a microscope by Roger Beaudoin of the New Hampshire State Police Crime Laboratory and he submitted certain samples to Charles Michael Hoffman of the laboratory of the Alcohol, Tobacco and Firearms Bureau of the United States Treasury Department for neutron activation analysis. Mr. Hoffman, a forensic chemist, after so analyzing these samples gave as his expert opinion that Susan Randall's coat had been in contact with the Breest automobile in the area from where debris was removed from the defendant's car which produced these samples. Roger Beaudoin as an expert in criminalistics gave as his opinion that there was a "high degree of probability" that "we have had a contact between this [Susan's] clothing and that [Breest's] car."

David Carita who had been incarcerated with the defendant while Breest was contesting extradition to New Hampshire testified that to Carita's inquiry as to whether Breest had killed "Susan" he responded "Yes I did." They also discussed other details about this matter according to Carita's testimony. Captain Doyon, now colonel, of the State police testified that in an interview with the defendant on March 15, 1971, Breest admitted having been in Manchester in the early evening of February 27 but denied returning later.

The defense presented two expert witnesses who disputed the conclusions of Hoffman as well as his methods of analysis. It also presented a series of witnesses who testified they saw automobiles stopped off the highway in the area of the Merrimack River

bridge in question on the night and morning of February 27 and 28, 1971.

On motions for dismissal and for a directed verdict for the defendant, the evidence must be construed most favorably to the State. *State v. Booton,* 114 N.H. 750, 762, 329 A.2d 376, 385 (1974), *cert. denied,* 421 U.S. 919 (1975). We hold that on the evidence before it, viewed in its entirety, the jury could find that the defendant was guilty beyond a reasonable doubt of the crime with which he was charged. *State v. Reed,* 114 N.H. 377, 379-80, 321 A.2d 581, 583 (1974); *State v. Gilbert,* 115 N.H. 665, 668, 348 A.2d 713, 717 (1975).

## II. Denial of Defendant's Motion to Suppress Statements Made to Captain Doyon

Prior to the trial, defendant moved to suppress statements which he allegedly made to Captain Doyon on March 15 because he did not receive the warnings required by *Escobedo v. Illinois,* 378 U.S. 478 (1964) and *Miranda v. Arizona,* 384 U.S. 436 (1966). The State admits that the defendant was a suspect in the murder of Susan Randall when he was interviewed and should have been warned of his constitutional rights. Captain Doyon testified three times under oath, on deposition, at the suppression hearing, and at the trial, that he gave the *Miranda* warnings to the defendant before talking to him. Breest relies heavily on the absence of a statement in the captain's report of the interview that he had given this warning. We know of no precedent, and none was advanced by the defendant, that such an omission renders defendant's statement inadmissible.

In any event the interview was the result of a telephone call by the defendant to Doyon stating that he would talk to him but to no other officer. Under these circumstances it could also be found that this was not a custodial interrogation with the coercive possibilities which required the *Miranda* warning. *Beckwith v. United States,* 96 S. Ct. 1612 (1976); *United States v. Carollo,* 507 F.2d 50, 51 (5th Cir. 1975), *cert. denied,* 423 U.S. 874 (1975); *United States v. Calhoun,* 363 A.2d 277, 283 (D.C. App. 1976). Defendant's exception is overruled.

## III. Denial of Defendant's Motions to Suppress Evidence Obtained from His Automobile and His Apartment Under Search Warrants

A. *Search of Automobile.* Under date of April 2, 1971, the District Court of Lowell in the Commonwealth of Massachusetts issued a warrant to search "a 1964 Ford Custom 4-door color white, 1971 N.H. MY 935, Serial #548M2207E 1156, registered to Ruth C. Smith (occupied by Robert Breest)." The property to be searched for was certain described wearing apparel of the late Susan Randall "and/or fibers of same, . . . and/or fingerprints, palm prints, footprints and toe prints" of Susan Randall.

Under date of April 3, 1971, a return was made to that court that the warrant had been executed together with an inventory of the property taken pursuant thereto. Listed therein was the 1964 Ford Custom Sedan described in the warrant, two partial prints from the left front door, material vacuumed from the front and rear seats and floors of that vehicle and a rear view mirror. Also listed as taken was one strand of hair from the dashboard and one small piece of glass from the passenger side floor. There were also described benzedrine tests for blood made of specified parts of this automobile with the results being strong, slight, or no reaction as to each part tested.

The search warrant had been issued by the Lowell District Court on an affidavit by Robert E. Liston, a sergeant of the Lowell Police Department. He stated therein that he knew personally Deputy Chief Jason D. Hines of the Concord police department who stated to him personally that a New Hampshire search warrant attached to Liston's affidavit and made part thereof had been issued by the Concord, N.H. District Court April 1, 1971. Liston further affirmed that Hines told him that each statement in the 6-page affidavit was true to the best of his knowledge and belief. Liston also stated that Hines affirmed that Captain Doyon of the New Hampshire State Police told him that he had spoken to Robert Breest at his residence at 9 Bowers Street in Lowell. Liston affirmed that he, with other Lowell police officers, had personally observed at that location on March 31, 1971, the vehicle described in the application for a search warrant.

The New Hampshire affidavit by Hines, made a part of the Liston affidavit, contained the following statements which are herein summarized. A partially nude body identified as that of

Susan Randall missing from her home in Manchester was found lying on the ice close to Bridge 47 of Interstate Highway 93. An autopsy report showed that Susan had suffered a severe beating. A girlfriend of Susan described in detail the clothes she was wearing about midnight February 27, 1971, when they parted in the area of Granite Square in Manchester. The owner of a restaurant in that area stated to two Manchester police officers that he observed a girl answering Susan's description hitchhiking in front of his place of business between midnight February 27 and 1:00 a.m., February 28, 1971. He saw this girl board a white car of 1963 or 1964 vintage.

Captain Doyon of the New Hampshire State Police informed the affiant Hines that on March 15, 1971, he saw Robert Breest, known to him, in Lowell and that Breest had in his possession a white 1964 Ford Sedan bearing a New Hampshire registration. The affiant was informed by a sergeant in the State police known to him that he interviewed one Jennie Haggett who told him that Robert Breest, whom she described, arrived at her home in the Granite Square Area at about 11:45 p.m. on February 27, spent approximately twenty-five minutes and left her home at 12:01 a.m., February 28, in a white Ford sedan. The distance from the Haggett home to Granite Square was about 4/10 of a mile. Sheriff Daniels of Merrimack County, New Hampshire, known to the affiant told him that an employee of a travel bureau who had previously supplied information which proved reliable said that a man identifying himself as Robert Breest visited her office on March 29, 1971, and inquired about travel plans from Manchester to Nevada, California, and Mexico and that he was operating a white Ford sedan bearing 1970 N.H. registration OL469. There was also information from the director of motor vehicles that on March 31, 1971, this vehicle, a 1964 Ford Custom Sedan white in color was assigned registration MY935.

It has been held in Massachusetts as well as in New Hampshire that "[t]he sufficiency of the affidavit is to be decided on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone." *Commonwealth v. Stewart,* 358 Mass. 747, 751, 267 N.E.2d 213, 216 (1971); *State v. Moreau,* 113 N.H. 303, 307, 306 A.2d 764, 766 (1973). On the contrary, affidavits for search warrants must be tested and interpreted in a commonsense and realistic fashion.

*United States v. Ventresca,* 380 U.S. 102, 108 (1965); *State v. Titus,* 106 N.H. 219, 222, 212 A.2d 458, 460 (1965).

We hold that taken as a whole the evidence presented to the magistrate was sufficient for him to find probable cause that Robert Breest picked up Susan Randall in the vicinity of Granite Square in Manchester in the early hours of February 28, 1971, gave her a severe beating and transported her or her body in his 1964 white Ford Sedan to Concord where her body was found. The magistrate could find further that there was a strong probability or substantial likelihood that a search would produce the evidence sought under the warrant. *United States v. Harris,* 403 U.S. 573, 577-80 (1971); *State v. Comeau,* 114 N.H. 431, 434, 321 A.2d 590, 592 (1974).

Defendant argues, however, that even if the affidavit is found on its face to have been sufficient to authorize the search of defendant's car, probable cause has been negated by the State's intentional omission of certain exculpatory information. This consists of the fact that the owner of the restaurant who saw the hitchhiker get into a white car was positive that the car in question was a Chevrolet Impala and not a Ford as alleged by the State. Also omitted was the fact that Captain Doyon who obtained the denial by Breest that he was in Manchester on February 27 after 10:30 p.m., searched the defendant's car on March 15, 1971 with defendant's permission and found no incriminating evidence.

Whether or not a defendant can attack the accuracy of an affidavit which is sufficient on its face to support a finding of probable cause to issue a search warrant has not been decided by the United States Supreme Court. *Rugendorf v. United States,* 376 U.S. 528, 531-32 (1964); *United States v. Belculfine,* 508 F.2d 58, 60 (1st Cir. 1974). State courts as well as lower federal courts are not in agreement as to if and when such a challenge can be made. *United States v. Carmichael,* 489 F.2d 983 (7th Cir. 1973); *United States v. Thomas,* 489 F.2d 664 (5th Cir. 1973), *cert. denied,* 423 U.S. 844 (1975); *Carter v. State,* 274 Md. 411, 337 A.2d 415 (1975).

Due process does not require that the government make a complete and detailed accounting of all police investigatory work on a case. *Moore v. Illinois,* 408 U.S. 786, 795 (1972). The mere possibility that an item of undisclosed information might have helped the defendant does not create a due process requirement that it be disclosed in an affidavit for a search warrant. *United States v. Agurs,* 96 S. Ct. 2392, 2401 (1976); *see In re Imbler,* 60 Cal. 2d 554, 569, 387 P.2d 6, 14 (1963), *cert. denied,* 379 U.S. 908

(1964). We hold that the omission of the items complained of in the affidavit for the search warrant in this case did not materially affect its integrity to the extent that it would negative its support for a finding of probable cause. *Commonwealth v. Rugaber,* 343 N.E.2d 865, 866 (Mass. 1976). Consequently it is unnecessary to decide whether this court would allow a facially sufficient affidavit to be attacked, and if permitted, what grounds must exist to obtain relief. *See* Herman, *Warrants For Arrest Or Search: Impeaching The Allegations Of A Facially Sufficient Affidavit,* 36 Ohio St. L.J. 721 (1975). Defendant's exceptions to the search warrants are overruled.

B. *Seizure and Subsequent Search of Defendant's Automobile.* The motor vehicle to be searched was specifically described in the search warrant. To conduct the search for the articles authorized by the warrant the police had to obtain possession and control of defendant's automobile. It was found in the parking lot of a Lowell hospital and brought to the Lowell police station where the search took place. This constituted a seizure of the car described in the warrant. *State v. Coolidge,* 106 N.H. 186, 191, 208 A.2d 322, 326 (1965); *Coolidge v. New Hampshire,* 403 U.S. 443, 453 (1971). It is evident that the seizure and the transportation of the car were necessary to adequately conduct the close examination contemplated by the search warrant. *Chambers v. Maroney,* 399 U.S. 42, 52 n.10 (1970); *Cardwell v. Lewis,* 417 U.S. 583, 595 (1974).

At the time the search warrant was obtained the affidavit establishing probable cause to believe that the other specified items in the warrant might be found in the automobile also established probable cause to believe that defendant's car might have been an instrumentality of the crime, that is, transporting Susan Randall or her body from Manchester to Concord. The failure to repeat the description of the automobile to be searched as also an object to be seized along with objects found therein cannot be said to have made its seizure unreasonable under the fourth amendment on the facts and circumstances. *Cooper v. California,* 386 U.S. 58, 62 (1967); *United States v. Rabinowitz,* 339 U.S. 56, 66 (1950); *South Dakota v. Opperman,* 96 S. Ct. 3092 (1976); *State v. Floyd,* 116 N.H. 632, 365 A.2d 738 (1976); *see Andresen v. Maryland,* 96 S. Ct. 2737, 2747-48 (1976).

The State described the defendant's automobile as an item seized in the inventory made to the Lowell District Court of the property taken pursuant to the search warrant it issued April 2, 1971. The State also obtained an order from that court authoriz-

ing its transportation to Concord for whatever use its police department might deem advisable in connection with the death of Susan Randall. Subsequent searches of the car made April 13, 1971, and August 11, 1971, were consistent with a thorough investigation of the crime in question. *State v. Johnson,* 162 Conn. 215, 226, 292 A.2d 903, 909 (1972). We hold that these constituted reasonable searches of an automobile validly held by the State as an instrumentality of the crime and as evidence in connection therewith. *Coolidge v. New Hampshire,* 403 U.S. 443, 502-04, 522 (1971) (concurring and dissenting opinions); *Warden v. Hayden,* 387 U.S. 294 (1967); *Andresen v. Maryland,* 96 S. Ct. 2737 (1976); *see Cooper v. California,* 386 U.S. 58, 61-62 (1967). Defendant's exceptions to the denial of his motion to suppress evidence seized from this automobile are overruled.

Defendant also maintains that certain particles of paint seized from his car should have been excluded as evidence because they were not specified as objects to be seized in the search warrant. They were part of the debris vacuumed in the search for hairs and fibers from Susan's clothing which were specified. They were properly admitted as incriminating matters which became in plain view as a result of proper activities in executing the search warrant and subsequent searches made of the seized automobile as an instrumentality and evidence of the crime. *Coolidge v. New Hampshire,* 403 U.S. 443, 464-73 (1971). Defendant's exception to their admission is overruled.

C. SEARCH AND SEIZURE OF ARTICLES IN DEFENDANT'S APARTMENT. He makes the same objections to the adequacy of the affidavit to show probable cause for the issuance of a search warrant for his apartment as he did to the affidavit for the warrant to search his automobile. The affidavits were essentially the same except that the results of the search of defendant's automobile were included in the affidavit for a warrant to search the apartment. We hold that latter affidavit was sufficient to show probable cause for the issuance of the search warrant. *United States v. Ventresca,* 380 U.S. 102, 108 (1965); *State v. Titus,* 106 N.H. 219, 222, 212 A.2d 458, 460 (1965).

IV. COMPOSITION OF JURY PANEL

The defendant attacks the constitutionality of RSA 500-A:2 (Supp. 1973) which provided then, as it does now (Supp. 1975), that the selectmen "shall ... make a list ... of such men and

women ... as they judge eligible to serve as jurors." The statute specifies certain persons who are or may be exempt from or ineligible for duty. RSA 500-A:2, :4, :10, :18, :19, :21 (Supp. 1975). Otherwise the classification of those "eligible" is left to the discretion of the selectmen. This court has consistently held that RSA ch. 500-A (Supp. 1975) is not rendered invalid for its failure to set forth more precise standards for the selection of jurors. *State v. Fleury*, 114 N.H. 325, 332, 321 A.2d 108, 113 (1974); *State v. Taschler*, 116 N.H. 218, 220, 356 A.2d 697, 698 (1976).

Defendant, who was thirty-four years of age at the time of trial, relies on questionnaires marked for identification which showed that only about 8 out of 110 jurors on the array were under the age of forty. The lists from which prospective jurors are selected need not be a statistical mirror of the community. *State v. Fleury*, 114 N.H. 325, 331, 321 A.2d 108, 112 (1974). The defendant had the burden of proving that the absence of a greater number of jurors under the age of forty resulted from a systematic and intentional exclusion of this group from the array of jurors to his prejudice. *Hamling v. United States*, 418 U.S. 87, 137 (1974); *State v. Greely*, 115 N.H. 461, 467, 344 A.2d 12, 17 (1975). This he failed to do and his exception is overruled.

## V. Admission of Defendant's Testimony at the Extradition Proceedings in Massachusetts

An assistant attorney general of Massachusetts testified at the trial to portions of defendant's testimony given at both the Governor's rendition hearing and at the habeas corpus hearing pertaining thereto. This testimony consisted of defendant's statements that he had been in Lowell on February 28, to March 1, 1971. Defendant maintains that such testimony is inadmissible under the same principles which exclude evidence given at a suppression hearing on fourth amendment grounds, *Simmons v. United States*, 390 U.S. 377 (1968), or at a bail hearing. *State v. Williams*, 115 N.H. 437, 443, 343 A.2d 29, 32-33 (1975).

Unlike the case of a suppression hearing there is no constitutional right to a hearing on a rendition petition before the Governor. *In re Murphy*, 321 Mass. 206, 72 N.E.2d 413 (1947). Hence no constitutional tension is likely to arise which is the basis for excluding the defendant's testimony at a suppression hearing. Nor is there the strong policy to encourage testimony by the defendant as there is at a bail hearing. However, under Massa-

chusetts law rendition can be contested by a writ of habeas corpus. Mass. Gen. Laws. ch. 276, § 19. In such a proceeding the burden is on the defendant to prove that he was not in the demanding State at the time of the alleged crime. *In re Baker,* 310 Mass. 724, 39 N.E.2d 762, *cert. denied,* 316 U.S. 699 (1942); *Fortier v. Frink,* 92 N.H. 50, 51, 24 A.2d 604, 605 (1942). This might create a tension similar to that presented at a bail hearing. However defendant's testimony that he was not present in New Hampshire at the time of the alleged crime is nothing more than what is raised by a plea of not guilty at the present trial. His testimony did not damage his defense in this case. *See United States v. Impson,* 531 F.2d 274 (5th Cir. 1976). We are convinced beyond a reasonable doubt that the admission of his testimony at that hearing, if error, was harmless error. *Schneble v. Florida,* 405 U.S. 427, 432 (1972); *Booton v. Hanauer,* 541 F.2d 296 (1st Cir. 1976).

## VI. ADMISSION OF SCIENTIFIC EVIDENCE

Defendant maintains that he has been denied due process of law by the admission of certain scientific testimony given by Roger Beaudoin and C. Michael Hoffman. He claims that these witnesses testified beyond their expertise and without any basis upon which to ground their conclusions.

Roger Beaudoin is supervisor and chief criminologist in the crime laboratory of the New Hampshire State Police. Defendant's counsel agreed that this witness could be declared by the court an expert "for testifying with regard to the evidence in this case." Beaudoin testified to the following. Certain clothing of the victim and other articles were given to him including fingernail clippings of the victim. These were examined for the presence of blood and were vacuumed for the presence of trace materials. Certain paint particles were discovered in the coat which he submitted personally to the United States Treasury Laboratory headed by Mr. Hoffman.

Beaudoin also received certain articles taken in a search of defendant's apartment which included a pair of boots. He found a discolored area on the right boot which responded positive to a test for the presence of blood. He also examined defendant's 1964 white Ford and found partial fingerprints of the defendant. He also obtained positive test responses attesting to the presence of blood in certain parts of the car. The car was vacuumed and by the use of a magnifying device Beaudoin examined the particles

which were obtained. He identified paint particles and hair from the victim's coat and similar particles and hair found in defendant's car and turned these over to Mr. Hoffman. Beaudoin testified that over the years of his service as head of the laboratory he had examined the debris taken from about 700 to 800 cars.

After an intense cross-examination by defense counsel, Beaudoin was asked the following question on redirect examination and made the following answer. Q. "Based upon your experience and the literature and any professional associations that you may have, do you have an opinion as to whether it is rare to have associations of articles as we do in this case between the vehicle and the coat?" A. "My opinion, simply, is this. There exists a high degree of probability and reasonable ability that we have had contact between this [victim's] clothing and that [defendant's] car." We hold that Beaudoin's opinion was within the field of expertness for which he was found qualified and that the trial court properly denied defendant's motion to strike his testimony.

C. Michael Hoffman is the chief of the forensic branch of the Bureau of Alcohol, Tobacco, and Firearms of the United States Treasury Department. He has had several years of experience working with radioactive nuclear materials. He testified that Beaudoin brought him several particles of various color paint specimens as well as some hair fibers represented to be from the clothing of Susan Randall and from defendant's automobile. He examined them microscopically to see if they looked alike and made microscopic photographs of them. He then submitted these samples to neutron activation because they had the same microscopic characteristics. He testified concerning his background experience and information pertaining to paints.

Hoffman described neutron activation analysis as follows. The material to be examined is encapsuled in a plastic container which is inserted into a nuclear reactor under pneumatic pressure for an appropriate length of time. The sample is then withdrawn and taken to a laboratory where electronic equipment is used to determine what radiation is being given off. This indicates what elements are present in the sample and the intensity of the signal indicates how much of each element is present. As a result of the test, certain specimens were excluded from consideration. However, Hoffman found that six sets of paints were comparable and that one set of hair was similar. He testified that it would be rare to find this number of corresponding paint particles and that in

his opinion based on the above findings the victim's coat was in contact with defendant's car. There was no objection to his testimony nor any motion that it be stricken.

The defense presented two experts in the same field of science who criticised the methods used by Hoffman as well as his conclusions. Neither of these experts conducted any tests of the paint particles or hair fibers in question. Their testimony went to the weight of the evidence rather than to its admissibility. *State v. Coolidge,* 109 N.H. 403, 419, 260 A.2d 547, 558-59 (1969) *rev'd on other grounds,* 403 U.S. 443 (1971), C. McCormick, Evidence § 204, at 497-99 (2d ed 1972); *see* Annot., 50 A.L.R.3d 117 (1973). Defendant's exceptions based on the grounds that the admission of the evidence of Beaudoin and Hoffman denied him due process of law are overruled.

### VII. Various Contentions That Defendant Was Denied a Fair Trial

A. *Closing Argument of Prosecutor.* Defendant maintains that the following statements in the State's argument were prejudicial and not supported by the evidence. They are the following: (1) defendant's boot was the murder weapon; (2) defendant's ring was responsible for the bruises on the victim's head; (3) a certain witness identified defendant as being the driver of the car who picked up the hitchhiker, Susan Randall; (4) the fingernail clippings from Susan's body indicated that her assailant was clawed to the bone.

Defendant did not object at the trial to these portions of the argument to which he is now complaining which, if improper, could have been stopped or nullified by the court. He has thus waived any right to have his objections considered on appeal. *State v. Breest,* 115 N.H. 504, 505, 345 A.2d 391, 392 (1975). Furthermore the trial transcript reveals that the prosecutor was not testifying or furnishing the jury with information of his own knowledge. On the contrary, he was drawing reasonable inferences from the evidence which did not exceed the bounds of legitimate advocacy. *State v. Bacon,* 114 N.H. 306, 310, 319 A.2d 636, 640 (1974).

B. *Sequestration of the Jury.* Defendant maintains that such a procedure in a lengthy trial distorts the panel's viewpoint and ability to fairly and impartially weigh the evidence. In a capital case such as this in which there is a reasonable likelihood that prejudi-

cial publicity could prevent a fair trial any doubt as to the propriety of preventing the jury to separate during the trial should be resolved against granting such permission. 75 Am. Jur. 2d *Trial* § 954 (1974). We find no abuse of discretion in the court's order and defendant has failed to show that he was prejudiced thereby.

C. *ADMISSION OF A PHOTOGRAPH OF VICTIM.* The court permitted the introduction in evidence of a photograph depicting the face of the victim prior to the time it had been cleaned by Dr. Katsas in performing the autopsy. There was no claim made that the picture did not represent the true situation. Its introduction was material to support the State's contention that Susan Randall died as a result of a severe beating. *State v. Hause,* 82 N.H. 133, 135, 130 A. 743, 744 (1925). The trial court could properly find that the photograph's probative value out-weighed the possible prejudice it might produce. *State v. Hayward,* 114 N.H. 792, 793, 330 A.2d 445, 446 (1974).

D. *TESTIMONY OF DR. KATSAS ABOUT A "SEXUAL ANGLE" TO THIS MURDER.* The doctor is a certified pathologist who has performed thousands of autopsies. The trial court could properly find in its discretion that the doctor's opinion, based on the circumstances surrounding Susan's death and on the injuries revealed by the autopsy, would be of help to the jury. *Pridham v. Cash & Carry Building Center, Inc.,* 116 N.H. 292, 296, 359 A.2d 193, 197 (1976).

E. *LATE FILING OF REPORTS BY POLICE OFFICERS.* Officer McLaughlin's report of activities on February 27, 1971, was not reduced to writing until April 12, 1972, after the defendant had been indicted. Lieutenant Engelhardt's report of an interview pertaining to the case was not put in writing until March 10, 1971. Defendant's counsel had an opportunity to cross-examine these witnesses and bring out these facts. There was no showing of resulting prejudice to the defendant. The lieutenant's report was available almost two years before the trial and that of the officer eleven months preceding the trial.

F. *IDENTIFICATION TESTIMONY BY DIANE CAMIRE.* This witness testified that defendant's build was consistent with that of the man she saw driving the white car which picked up the hitchhiker on the early hours of February 28, 1971. On cross-examination defense counsel questioned her about several police reports of interviews and asked her to read portions of them to the jury. These reports were marked for identification but the trial court after comparing them with her testimony denied defendant's request that they be

marked as exhibits. The trial court could properly rule in its discretion that it was not necessary to have these reports entered as exhibits in order for the jury to understand their impeaching weight and significance. *Wieszeck v. Sepessy,* 116 N.H. 160, 162, 355 A.2d 865, 867 (1976).

G. *CHARACTERIZATION OF SCRATCHES ON DEFENDANT'S HANDS.* Captain Doyon of the New Hampshire State Police testified that in his interview with the defendant on March 15, 1971, he observed scratches on the defendant's hands. Doyon characterized them in his testimony at the trial as "defensive" scratches. The trial court could properly find that this observation made by a trained and experienced police officer could be of help to the jury. *Walker v. Walker,* 106 N.H. 282, 284-85, 210 A.2d 468, 470 (1965).

H. *REFUSAL TO ADMIT A PHOTOGRAPH OFFERED BY DEFENDANT.* There was some diversity in the testimony as to whether Susan Randall carried a pocketbook with a strap on the night she was hitchhiking. The defense, some time after that date, photographed a witness wearing a pocketbook which she claimed was similar to the one she observed the victim carrying on February 28, 1971. The trial court properly excluded this posed photograph as it could be found to accentuate unduly defendant's contention on a contested issue. C McCormick, Evidence § 214, at 533 (2d ed. 1972).

I. *VICTIM'S MOTHER SEATED NEAR JURY.* Defendant maintains that unknown to him Susan Randall's mother occupied a seat near the jury during the trial which he alleges allowed her to view the members of the panel as they moved in and out of the court room. It is mere speculation that the mother thus communicated with the jurors by her eyes or body motions to the prejudice of the defendant. We cannot hold as a matter of law that defendant was prejudiced thereby.

J. *THE TESTIMONY OF DAVID CARITA.* The defendant acting pro se in a supplemental brief challenged the testimony of this witness who was incarcerated in the same jail where defendant was awaiting extradition. Carita testified that in conversations between them the defendant admitted he had killed Susan Randall. He was exhaustively cross-examined by defendant's counsel. His testimony, like that of any other witness, was subject to whatever weight the jury might choose to give it. No objection to his testifying was made nor was there a motion made to strike his testimony. We cannot say that his testimony was incredible as a matter of law. *Gilliam v. Waltsons Corporation,* 105 N.H. 373, 376-77, 201 A.2d 107, 109-110 (1964).

## VIII. Sentencing of Defendant Certified as Convicted of a Murder Psycho-sexual in Nature under RSA 607:41-c (Supp. 1972) now RSA 651:45-c

On March 22, 1973, the jury returned a verdict that defendant was guilty of murder in the first degree of Susan Randall at Concord on February 28, 1971. The defendant admits in his brief that on the latter date the penalty for this crime was life imprisonment with no minimum term. This barred those convicted of first degree murder from ever being paroled. RSA 607:43 (1955); RSA 585:4 (1955). However, effective July 1, 1971, the legislature (Laws 1971, 419:3) provided that a prisoner serving a sentence of life imprisonment could be released on parole at any time after having served eighteen years which shall be deemed the minimum term of his sentence. RSA 607:41-a (Supp. 1972).

By Laws 1972, 22:1 effective May 14, 1972, the legislature amended the latter provision and excepted from its application a person convicted of murder in the first degree which was psychosexual in nature. RSA 607:41-a (Supp. 1972). RSA 607:41-b (Supp. 1972) provided that a prisoner who is serving a sentence of life imprisonment for a first degree murder psycho-sexual in nature was not eligible for parole until he shall have served forty years, minus certain specified credits. RSA 607:41-c (Supp. 1972) required that whenever a person is convicted of murder in the first degree, the presiding justice shall certify, at the time of sentencing, whether or not such murder was psycho-sexual in nature. RSA 607:41-d (Supp. 1972) defined such a murder. The above sections, with certain amendments not material here, are now RSA 651:45-a to d. After the verdict of guilty on March 22, 1973, the presiding judge sentenced the defendant to life imprisonment. On April 5, 1973, on motion of the State, this murder was certified by the judge as being psycho-sexual in nature, which triggered the consequences described above.

Defendant first maintains that because he had already started to serve his sentence the certification which took place beyond the same term of court was contrary to our holdings in *State v. Thomson*, 110 N.H. 190, 263 A.2d 675 (1970), and *State v. Dunn*, 111 N.H. 320, 282 A.2d 675 (1971), that the superior court could review a valid sentence after the expiration of the term if the defendant had not started to serve it but could not reduce a sentence which was being served. In the present case, unlike the

above situations, there was no complete or valid sentence until April 5, 1973, when the trial court complied with the requirements of RSA 607:41-c, now RSA 651:45-c which determined the minimum term of eligibility for defendant's parole. *See State v. Richard,* 99 N.H. 126, 106 A.2d 194 (1954).

The omission to certify the type of murder at the sentencing which followed the verdict in a previous term of court did not prejudice the defendant as "[t]erms of court have less magical meaning today than they did at common law." *State v. Thomson,* 110 N.H. 190, 191, 263 A.2d 675, 676 (1970). Furthermore, the delay in completing the sentence gave defendant's counsel additional time in which to prepare their arguments to the court on the certification of the type of murder. *See State v. Bell,* 112 N.H. 444, 449, 298 A.2d 753, 757 (1972). Nor did it constitute double jeopardy by subjecting the defendant to multiple punishments for the same offense contrary to N.H. CONST. pt. I, art. 16 or the fifth amendment to the Federal Constitution as he was subjected to only one valid and complete sentence. *United States v. Dinitz,* 424 U.S. 600, 606 (1976); *see Warden v. Marrero,* 417 U.S. 653, 663 (1974).

Defendant also argues that he was subjected to an ex post facto law because he was sentenced under a statute which was not in effect at the time the alleged crime was committed which imposed a detrimental increase in punishment in violation of N.H. CONST. pt. I, art. 23 and U.S. CONST. art. 1, § 9. The evil prohibited by these constitutional provisions is the punishment for an act which was not criminal at the time of its commission or the inflicting of a greater punishment for it. *Woart v. Winnick,* 3 N.H. 473, 476 (1826); *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 393 (1798); *State v. Vashaw,* 113 N.H. 636, 637, 312 A.3d 692, 693 (1973); 1 C. Antieau, Modern Constitutional Law § 5.135 (1969).

On February 28, 1971, the date of the crime, defendant was subject to a sentence of life imprisonment without ever being eligible for parole because no minimum term was imposed under such a sentence. RSA 607:39, :43 (1955); RSA 585:4 (1955). Subsequent legislative acts, passed before defendant was sentenced, previously set out in this opinion, provided that those who committed a first degree murder of a psycho-sexual nature were eligible for parole after forty years while those convicted of ordinary murder are eligible for parole after only eighteen years of serving the sentence. This legislative provision operates to mitigate the penalty of life imprisonment without parole to which defendant

would have been subject to on the date of the crime and not to increase or modify that punishment to his disadvantage. *See Warden v. Marrero,* 417 U.S. 653, 663 (1974); *In re Medley,* 134 U.S. 160, 171 (1890); 2 Sutherland, Statutory Construction § 42.05 (4th ed. C. Sands 1973).

Finally defendant's contention that RSA 607:41-b to d (Supp. 1972) (now RSA 651:45-b to d) is unconstitutionally vague, creates a new crime for which defendant must be indicted and tried, and that he was deprived of his constitutional rights of due process thereunder was transferred to this court without ruling by the trial court. RSA 607:41-d (Supp. 1972), now RSA 651:45-d, defines a murder which is psycho-sexual in nature as follows: It "means murder in which there is evidence that the offender has committed sexual assault or abuse or attempted sexual assault or abuse of the victim before or after death." We hold that this definition provides ample notice of its purpose and prohibitions in such a manner that men of common intelligence need not guess at what is intended. *Smith v. Goguen,* 415 U.S. 566, 574 (1974); *State v. Blake,* 113 N.H. 115, 120, 305 A.2d 300, 304 (1973). This statute clearly provides for special treatment of those who commit a first degree murder of a type sufficiently described in it.

This statute does not create a new and distinct criminal charge requiring a new finding of fact which was not a part of the charge of murder in the first degree for which the defendant was tried. *Specht v. Patterson,* 386 U.S. 605 (1967). Rather, the psycho-sexual certification affects the penalty for the offense of murder for which defendant has been found guilty with all the due process requirements of right to counsel, opportunity to be heard, to be confronted with the witnesses against him, and to offer evidence of his own. *United States v. Stewart,* 531 F.2d 326, 332, n.2, 334 (6th Cir. 1976), *cert. denied,* 96 S. Ct. 2629 (1976); *Williams v. New York,* 337 U.S. 241, 246 (1949).

At the certification or sentencing stage of the proceedings the above requirements of due process are not required. The judge can "exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams v. New York,* 337 U.S. 241, 246 (1949). In this instance the presiding judge could properly base his certification that the murder in this case was psycho-sexual in nature on all the evidence presented at the trial including the opinion of Dr. Katsas that the circumstances surrounding Susan Randall's death including the injuries

which he found in the autopsy "do indicate a sexual angle". This certification was made after counsel had an opportunity to argue at length for and against such a finding at a hearing before the presiding justice. We hold that on the record the court could properly make such a certification and that the due process requirements for that stage of the trial, that is, the sentencing stage, were met. *Williams v. New York,* 337 U.S. 241, 252 (1948); *see United States v. Stewart,* 531 F.2d 326 (6th Cir. 1976), *cert. denied,* 96 S. Ct. 2629 (1976); *State v. Martineau,* 112 N.H. 278, 293 A.2d 766 (1972).

Our answer to the transferred question is "No," RSA 607:41-b to d (Supp. 1972), now RSA 651:45-b to d, is not unconstitutionally vague, does not create a new crime and the defendant was not deprived of his constitutional rights thereunder. The order is

*Exceptions overruled.*

Bois, J., did not sit; the others concurred.