Merrimack
No. 7731
No. 7821

THE STATE OF NEW HAMPSHIRE

v.

GARY S. FARROW

THE STATE OF NEW HAMPSHIRE

v.

JAMES SMITH

April 28, 1978

*Russell F. Hilliard* and *Ernest T. Smith, III*, of Concord (*Ernest T. Smith, III* orally), for Gary S. Farrow.

*Dunn & Hilliard*, of Concord (*Russell F. Hilliard* orally), for James Smith.

*David H. Souter*, attorney general (*Peter W. Heed*, assistant attorney general orally), for the State.

DOUGLAS, J. The primary challenge of defendants in these cases is to the power of the legislature to prescribe the penalty of life imprisonment without possibility of parole for first-degree murder. In order to be convicted of first-degree murder a person must have purposely caused the death of another, that is "that the actor's conscious object is the death of another, and that his act or acts in furtherance of that object were deliberate and premeditated." RSA 630:1-a II (Supp. 1977). Upon conviction for this crime, the perpetrator "shall be sentenced to life imprisonment and shall not be eligible for parole at any time." RSA 630:1-a III (Supp. 1977). Both defendants were found guilty of first-degree murder at separate trials by jury and sentenced by the Court (*Johnson*, J.) in accordance with the statute.

The decedent, Michael Stitt, was mentally enfeebled from brain damage suffered as a youth. He became acquainted with the defendants while all three were serving terms in Merrimack County and where both defendants had beaten Stitt and were punished. Farrow later threatened Stitt as a result of this incident. After Stitt and Farrow had been released, Stitt borrowed $1.60 from the latter. When Farrow was not promptly repaid, he raised the debt to over $20.

On the night of the murder, the defendants, accompanied by Cheryl Keiler-Frye and her friend, Deborah Pratt, were at a Concord bar. The State alleges in its brief that both women were deeply involved in selling drugs. At about 8:00 p.m., the defendants left the bar and met Stitt, whom they apparently threatened about the money. Stitt then went to a coffee house. In a conversation with the proprietor, Stitt related his fears about someone to whom he owed money. His body was found the next morning near the State liquor warehouse with multiple stab wounds, abrasions, and a slit throat.

The remaining facts are in dispute. According to the testimony of Miss Keiler-Frye, which the State obtained by immunizing her from drug charges, she left the bar alone at 9:00 p.m. to search for Farrow. As she approached the State liquor warehouse, she heard Farrow's voice and shrieking from a third person. Coming closer, she observed the defendants kicking a prone body. She testified that she next saw

defendants do something that Farrow later told her was tossing a coin to decide who would kill Stitt. Farrow was designated, and Smith handed him the knife with which Farrow murdered Stitt. Defendant Smith claims that Miss Keiler-Frye could not have witnessed these events because she was constantly with Deborah Pratt during the time they supposedly occurred. However, the State was not willing to grant immunity to Miss Pratt from the same drug-dealing charges as it had Miss Keiler-Frye. When Miss Pratt was called to testify, she pleaded her fifth amendment right to remain silent to all questions except the one calling for her name.

Smith assigns as error the refusal of the State to immunize from prosecution his alleged exculpatory witness. He also excepts to certain aspects of the jury selection proceeding and testimony concerning his hair type. Both defendants challenge the constitutionality of RSA 630:1-a III (Supp. 1977), under which they were sentenced to life imprisonment without possibility of parole. Since the last issue is common to both defendants, we consider it first.

I

The defendants' challenge to RSA 630:1-a III (Supp. 1977) is founded on several prongs. They argue that a right to parole is guaranteed by the substantive aspect of the due process clause of the fourteenth amendment to the United States Constitution. Alternatively, life imprisonment without parole constitutes cruel and ususual punishment prohibited by the eighth amendment, which the due process clause makes applicable to the States, *Robinson v. California*, 370 U.S. 660 (1962). Defendant Farrow also argues that a mandated sentence is a legislative usurpation of a judicial function and a violation of our State Constitution. N.H. Const. pt. I, art. 18.

In meeting the defendants' arguments, the State cites several cases in which sentences of life imprisonment without parole were upheld for murder, *Green v. Teets*, 244 F.2d 401 (9th Cir. 1957); *State v. Spence*, 367 A.2d 983 (Del. 1976), kidnapping, *State v. Taylor*, 82 Ariz. 289, 312 P.2d 162 (1957); *People v. Isitt*, 55 Cal. App. 3d 23, 127 Cal. Rptr. 279 (1976), and rape, *Edwards v. Commonwealth*, 500 S.W.2d 396 (Ky. 1973). *But cf. Workman v. Commonwealth*, 429 S.W.2d 374 (Ky. 1968) (life without parole cruel and unusual punishment for 14-year-old convicted of rape). The only one of these cases that analyzes the constitutionality of paroleless sentences in detail focuses on only one aspect of the eighth amendment—whether life imprisonment without parole is a disproportionate sentence for

kidnapping. *People v. Isitt supra.* Only two cases considered the constitutionality of a statute that imposed mandatory life sentences. *State v. Taylor supra; State v. Spence supra.* Both cases give only summary consideration to the constitutionality of such statutes and only *Spence,* of all the State's cases, was decided after the Supreme Court held that mandatory death sentences, lacking discretion, were unconstitutional. *Roberts v. Louisiana,* 428 U.S. 325 (1976); *Woodson v. North Carolina,* 428 U.S. 280 (1976). Hence we consider the defendants' arguments against mandatory paroleless life sentence statutes on first impression.

## A

The defendants' first contention — that a right to parole exists in the substantive aspect of the due process clause — is meritless. Since 1937, the due process clause has been used to protect substantive rights which are fundamental to notions of ordered liberty, *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), *overruled on other grounds, Benton v. Maryland,* 395 U.S. 784 (1969), " ' which belong . . . to the citizens of all free governments. . . .' " *Poe v. Ullman,* 367 U.S. 497, 541 (1961) (Harlan, J., dissenting), *quoting Corfield v. Coryell,* 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3,230). Few claims rise to that standard. Indeed, the only previously unarticulated substantive rights judicially protected through the due process clause since 1937 have concerned the particularly intimate area of heterosexual sexual relations, marriage, and procreation. *See Roe v. Wade,* 410 U.S. 113 (1973) (abortion); *Griswold v. Connecticut,* 381 U.S. 479 (1965) (privacy). *See also Whalen v. Roe,* 429 U.S. 589 (1977). In the most comprehensive judicial exegesis of the meaning of "due process," Justice Harlan suggested guidelines to aid judges in evaluating novel claims:

> [The content of 'due process'] represent[s] the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. . . . The balance . . . is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke.
>
> . . . .
>
> Each new claim to Constitutional protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically

developed. . . . The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria.

*Poe v. Ullman*, 367 U.S. at 542–44 (Harlan, J., dissenting).

Measured against this standard, the defendants' claim must fail. There is nothing in the history of Anglo-American jurisprudence to suggest that parole constitutes a fundamental right. The first parole statute was enacted 101 years ago in New York; the federal parole statute did not follow until forty years later. Note, *Parole Revocation in The Federal System*, 56 Geo. L. J. 705 (1968). Although the practice of parole is an integral part of American penological systems and has outrun its erstwhile experimental nature, *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972); Note, *Parole: A Critique of Its Legal Foundations and Conditions*, 38 N.Y.U.L. Rev. 702 (1963), its widespread use does not convert a matter of legislative grace into a fundamental right. *Cf. Stone v. Perrin*, 118 N.H. 109, 382 A.2d 1112 (1978).

▮ Because parole is not an interest that receives enhanced protection under the due process clause, the State need have only a rational purpose in denying parole. We have already characterized the need to protect society against murderers as compelling. The permanent isolation of such persons from the community certainly bears a rational relation to that end. And seeking to avert any miscarriage of justice that occurs when the parole authorities release dangerous felons by restricting the power to release murderers to the Governor through his pardoning power, also furthers the State's goal. We hold that no right to parole exists in substantive due process.

## B

▮ The defendants also claim that life imprisonment without possibility of parole is cruel and unusual punishment. Although the Supreme Court has considered the meaning of "cruel and unusual" on numerous occasions, it has yet to promulgate one all-inclusive test that a majority of the Justices have sanctioned for measuring all penalties. However, a reading of these opinions discloses some criteria for testing any sentence. Punishment must not be disproportionate to the crime for which it is imposed. *Coker v. Georgia*, 97 S. Ct. 2861, 2865 (1977); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). It must be acceptable according to contemporary standards and comport with basic notions of human dignity. *Gregg v. Georgia*, 428 U.S. at 182; *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958).

Finally, at least with regard to death sentences, the punishment must not be imposed arbitrarily and must be administered in a statistically significant number of similar cases. *Gregg v. Georgia*, 428 U.S. at 188; *see Woodson v. North Carolina*, 428 U.S. at 302. The finder of fact must be given objective standards for imposing a death sentence but must retain some discretion to choose a lesser punishment based on particularized facts. *Roberts v. Louisiana*, 428 U.S. 325 (1976); *Woodson v. North Carolina supra.* However the applicability of the arbitrariness test, in whole or in part, to crimes other than those for which death is prescribable is uncertain. *See Woodson v. North Carolina*, 428 U.S. at 302–05; *Gregg v. Georgia*, 428 U.S. at 188–89.

Measuring the sentence of life imprisonment without parole against the purposes society has in punishing crime, we find nothing per se disproportionate in these sentences for first-degree murder. RSA 630:1-a II (Supp. 1977) requires that the defendant consciously, deliberately, and premeditatively cause the death of his victim in order for the State to exact such a punishment. Surely under the retribution rationale, which remains a societal goal, *Gregg v. Georgia*, 428 U.S. at 183–84, the State could exact the death penalty for such a crime. *Id.* Thus with regard solely to proportionality, a life sentence without parole is acceptable *a fortiori* in these cases. The State could also conclude that a person who acts in the manner proscribed by the statute is incapable of rehabilitation and must be isolated from society for the remainder of his life.

The defendants argue most strongly that even if paroleless life sentences satisfy contemporary standards of penology, they do not comport with basic notions of human dignity. That argument derives from *Trop v. Dulles*, 356 U.S. 86 (1958), in which the Supreme Court struck down the punishment of denationalization for treason even though that crime could be punished by death. The defendants characterize their punishment as reducing them to "caged animals" "without purpose to reform," to "the lowest level of existence," doomed to "the dismal spectre of gradual annihilation." Their sentences, the defendants argue, are the "ultimate degradation unsurpassed in enormity."

Admittedly punishment less severe than death can be unconstitutional under an eighth amendment test. However, we do not think that *Trop* requires the blanket invalidation of paroleless life sentences. The Supreme Court itself considered and upheld such a sentence imposed as a condition to presidential commutation of a death sentence.

> The no-parole condition attached to the commutation of his death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; it does not offend the Constitution.

*Schick v. Reed*, 419 U.S. 256, 267 (1974) (footnote omitted). *Schick* deals with the presidential pardoning power; it might be *sui generis*. However, because unconstitutional conditions cannot be imposed even on matters of grace, *Sherbert v. Verner*, 374 U.S. 398 (1963); see Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 Harv. L. Rev. 1439, 1445–49 (1968), we believe that the Supreme Court would not have upheld a paroleless life sentence even under the pardoning power unless the sentence itself were valid.

 Moreover as the State demonstrates, the defendants have the hope of increased privileges and responsibilities inside the prison through good conduct. The defendants will have the opportunity to obtain educational and vocational training within prison and could ultimately receive an executive pardon. Thus the defendants' outlook is far from the bleak future they attempt to paint. We find that paroleless life sentences comport with basic concepts of human dignity.

Assuming *arguendo* that an arbitrary sentence violates the eighth amendment, not all of the components of the test of arbitrariness used to review capital crimes apply in evaluating sentences for noncapital crimes. *See Woodson v. North Carolina*, 428 U.S. at 304; *Gregg v. Georgia*, 428 U.S. at 188–89. Death is unique among punishments; it is different in kind rather than degree. *Woodson v. North Carolina*, 428 U.S. at 303–04. We therefore hold that RSA 630:1-a III (Supp. 1977) is valid under the Federal Constitution.

C

The defendants raise two claims under the New Hampshire Constitution. They argue first that under article 18 of Part I, parole cannot be legislatively denied. Second they contend that the legislature improperly tampered with an inherent judicial function when it withdrew discretion to impose differing sentences on different facts. We disagree with both contentions.

 Whether the language of part I, article 18, that "[t]he true design of all punishments being to reform, not to exterminate mankind," is directory, as the State argues, *see State v. Foster*, 80 N.H. 1, 7, 114 A. 277 (1921), or mandatory, that language does not

create a right to parole. Article 18 has endured unchanged since 1793. As we noted, the first parole statute in this country was enacted in 1877. Research discloses no forerunner to our current parole statute before 1901. *See* Act of Mar. 7, 1901, ch. 58, [1901] N.H. Laws 547. Therefore the meaning of the article 18 language could not have included parole when written or ratified. Moreover, the language itself seems primarily directed only at execution, and this court has never held that article 18 invalidates a capital punishment statute.

The State's important goals in confining someone for life are all well served by withholding the possibility of parole; and the punishment is not a sentence of extermination because the prisoner has many opportunities to improve his life, culminating with a pardon if he can demonstrate to the Governor and Council his fitness to return to society without being a threat to it. We cannot say that the legislature is powerless to make the judgment that certain heinous crimes merit imprisonment for life without parole.

The defendants' second argument is no more availing to their claim. Article 5 of part II specifically gives the General Court the power to make all laws with or without penalties, limited only by the requirement that they conform to the constitution. The function of the legislature is to make the law; the function of the judiciary is to interpret the law and apply it. If there is no constitutional requirement to consider each offender individually, the proper body to set the parameters of punishment for a given crime is the body that defines the crime—the legislature. A legislative limitation on the power of the parole board to release those whom a court has sentenced does not infringe on the judicial function. *See State v. Taylor*, 82 Ariz. at 294, 312 P.2d at 166. The General Court has determined that those who commit the reprehensible acts covered by RSA 630:1-a II (Supp. 1977) must be isolated from society for the remainder of their lives. We cannot second guess that judgment.

## II

Defendant Smith advances further arguments to challenge his conviction. The first is that his chief exculpatory witness should have been immunized from prosecution. We have held, based on the overwhelming weight of authority, *see e.g., United States v. Allessio*, 528 F.2d 1079 (9th Cir. 1976), *cert. denied*, 426 U.S. 948 (1976); *United States v. Allstate Mortgage Corp.*, 507 F.2d 492 (7th Cir. 1974), *cert. denied*, 421 U.S. 999 (1975), that there is no constitutional right to have a defense witness immunized because that witness

has exercised his fifth amendment rights. *State v. Linsky,* 117 N.H. 866, 884, 379 A.2d 813, 824 (1977).

However, situations could arise in which to deny immunization from prosecution would deprive a defendant of due process on the facts of his case. *See Earl v. United States,* 361 F.2d 531, 534 n.1 (D.C. Cir. 1966). The State's testimony was obtained by immunizing its principal witness from the identical charge, based on the identical transaction, that threatens Smith's alleged exculpatory witness. Indeed, if anything, the State's witness is more culpable, having witnessed a felony and not reported it. We noted carefully in *Linsky* that "the state did not secure any of its evidence by means of an immunity grant." *State v. Linsky* 117 N.H. at 884, 379 A.2d at 824–25. Moreover the defendant's witness would allegedly impeach the testimony of the witness without whose testimony the State could not have obtained a conviction.

Nevertheless under the facts of this case we do not believe that the defendant was denied due process when his witness was not immunized from prosecution. Smith's witness could not have provided Smith with an alibi or in any other way directly exculpated him. She could only have cast doubt upon an admittedly crucial State witness. More importantly the record of the statement she gave to the police does not compel the conclusion that her testimony would impeach the State's eyewitness. That recorded statement is reconcilable with the testimony that the State elicited at trial.

██ ██ Not only do we believe that the testimony he seeks to obtain would not have prevented conviction, but we also note that the defendant did not challenge the failure of the State to immunize his witness until *after* trial. Our rules require that such a challenge be raised at trial, and that an exception be taken from an unfavorable ruling at that time. *See State v. Labranche,* 118 N.H. 176, 385 A.2d 108 (1978); *cf. Wainwright v. Sykes,* 433 U.S. 72 (1977). Considering this last factor, we find that the balance of the equities does not require the State, as a matter of due process, to have immunized Smith's witness.

### III

We find the remainder of Smith's challenges meritless. The first claim is that Smith's trial was unduly prejudiced by the method of jury selection. RSA ch. 606 provides that in a murder trial, the defendant shall have twice as many peremptory challenges as the State. The trial judge required that every time the State had to exercise

its peremptory challenge, the defendant would have to "go first" twice.

 We find that this does not constitute prejudice. The trial judge is allowed broad discretion in the jury selection process. *See State v. Fleury*, 114 N.H. 325, 321 A.2d 108 (1974); *State v. Prevost*, 105 N.H. 90, 193 A.2d 22 (1963). There is nothing in either the United States Constitution or that of New Hampshire that requires the State to grant the defendant more peremptory challenges than it gives itself. We cannot perceive how making the defendant use his challenges at the same rate as the prosecution is inherently unfair, nor does the defendant cite us to any authority for his argument. We do not believe that requiring peremptory challenges to be exercised in this manner constitutes an abuse of discretion.

 The defendant's final contention is that the evidence that hair matching his type was found on the victim's body should not have been admitted. The defendant objected on the ground that the prejudicial effect of this testimony exceeded its probative value. Admission of evidence which is challenged in this manner is a question of fact collateral to the substance of the evidence and a trial judge has broad discretion to admit evidence. *State v. Conklin*, 115 N.H. 331, 338, 341 A.2d 770, 776 (1975); *see State v. Perron*, 118 N.H. 245, 385 A.2d 225 (1978) (memorandum). His decision will be upheld if there is evidence to support it, unless he abused that discretion. *See Amabello v. Colonial Motors*, 117 N.H. 556, 374 A.2d 1182 (1977). Although the State's witness could not positively testify that the hair was that of Smith, he did testify the hair found was similar to Smith's hair in all fifteen recongized microscopic characteristics. The weight of this evidence was for the finder of fact. The evidence itself was clearly relevant and it was not of the type so inherently prejudicial that we could say the judge abused his discretion in admitting it. *See State v. Breest*, 116 N.H. 734, 748–50, 367 A.2d 1320, 1331–33 (1976).

After careful consideration of the defendants' claims, we hold that the convictions and sentences are constitutional and must be affirmed.

*Exceptions overruled.*

LAMPRON, J., did not sit; the others concurred.