Cheshire
No. 80-475

### THE STATE OF NEW HAMPSHIRE

v.

### CHARLES RADZIEWICZ

March 10, 1982

*Gregory H. Smith*, attorney general (*Peter W. Mosseau*, assistant attorney general, on the brief and orally), for the State.

*Stephen R. Goldman* and *Dennis Pizzimenti*, of Concord (*Mr. Goldman* and *Mr. Pizzimenti* on the brief, and *Mr. Goldman* orally), for the defendant.

BROCK, J.   After a bifurcated jury trial (*see Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978)) in the Cheshire County Superior Court, the defendant was found guilty on three counts: first-degree murder (RSA 630:1-a); robbery while armed with a deadly weapon (RSA 636:1 III-a); and conspiracy to commit armed robbery (RSA 629:3). The Trial Court (*Wyman*, J.) sentenced the defendant to life imprisonment without the possibility of parole. RSA 630:1-a III; *State v. Farrow*, 118 N.H. 296, 300–05, 386 A.2d 808, 810–14 (1978).

Contending that certain evidence admitted at trial was obtained through illegal searches and seizures, and that the jury observed a rifle not introduced into evidence, the defendant appeals to this court. Finding no error in the proceeding below, we affirm.

During the evening of December 16, 1978, Wayne Perkins, a high school senior, was fatally wounded by a point-blank shotgun blast to his chest while working at a Sunoco gas station in Keene. Five days later, an armed robbery occurred at Romy's Market, also located in Keene. Witnesses to the robbery reported to the police that the assailant was carrying a large-barreled gun, approximately eighteen inches long, and that the robber was in his twenties, five feet four to five feet five inches tall, of light build and wearing a plaid shirt and glasses.

It was also established that five hundred dollars was taken during the robbery, and that the robber's speech seemed to be slurred. Other witnesses reported that the robber fled in a bluish four-door Valiant and was last seen heading east on Marlborough Street. The license plate was reported by a witness to be XG 1304. Once this information had been obtained, the police immediately broadcast a bulletin over their radio.

While patrolling on Route 101 in Marlborough, Henry Southwell, Chief of the Marlborough Police Department, heard the bul-

letin as it was broadcast over a mutual aid frequency. Within minutes, he saw a green Valiant with the license plate number XG 3104—very similar to plate number XG 1304 that was reported by the witnesses to the robbery. Chief Southwell had been observing this vehicle for several minutes when, while traveling westerly on Route 101, it suddenly veered across a solid center-line. He stopped the vehicle. Because the operator of the vehicle performed poorly on field sobriety tests, he was arrested for driving while under the influence, RSA 262-A:62 (Supp. 1979), searched for weapons, advised of his *Miranda* rights, and transported to the Keene police station by Chief Southwell.

Upon his arrival at the Keene police station, the defendant's *Miranda* rights were once again explained to him, and he acknowledged that he understood them both orally and in writing. In addition, he signed a written waiver of his rights. The defendant was asked a number of questions, and he stated that he had taken both drugs and alcohol prior to his arrest. In the presence of a State trooper, the defendant once again performed poorly on sobriety tests and was given a breathalyzer test. The test indicated that the defendant's blood alcohol content was .04%, a reading which is considered *prima facie* evidence that the defendant is not under the influence of intoxicating liquor. RSA 262-A:63. At approximately this time, Douglas Fish, the Keene Police Lieutenant responsible for investigating the robbery at Romy's Market, returned to the police station and observed Chief Southwell's prisoner. Lieutenant Fish, recalling the description of the robbery suspect given to him by witnesses only shortly before, then stated "that was the same guy as in Romy's." He asked Chief Southwell for the prisoner's automobile registration and discovered that it was for a 1968, four-door, green Valiant with the license plate number XG 3104.

Within moments of Lieutenant Fish's declaration, another officer noticed a bulge in the prisoner's clothing and a pat-down search was conducted. The search resulted in the discovery of five hundred dollars in the prisoner's boot. Almost immediately after that discovery, Lieutenant Fish questioned the defendant about the Romy's Market and the gas station robberies. The defendant told him that he was home "all night" on the night that the gas station robbery-murder took place. A short time later, the defendant requested that he be allowed to contact his attorney. Questioning of the defendant terminated at that time. Except for the fact that the defendant was formally charged with murder and robbery about four hours later, events relating to his presence at the police station during the remainder of the evening are not relevant on this

appeal because the State elected not to use at his trial any of the incriminating statements made during this period of time by the defendant.

Prior to the time that the defendant was formally charged, and while he was in custody, the police officers traveled to the defendant's apartment. Sandra Scadova, his girlfriend, answered the door. The officers identified themselves, informed her that they were investigating a robbery and murder and, as a precaution, advised her of her constitutional rights. She was then told that they wished to search the apartment for a cash drawer and a shotgun, but she initially refused to consent to such a search. At that point, Lieutenant Fish left the apartment in order to seek a search warrant. Chief Southwell remained at the apartment with Ms. Scadova. Chief Southwell and Ms. Scadova, who once had been an employee of the Chief, engaged in casual conversation for a time, and then Chief Southwell told her that "it would be easier for her to allow the search." After a few minutes of reflection, she consented to a search of the apartment. Chief Southwell then called Lieutenant Fish, who returned to the apartment. Once Lieutenant Fish returned, Sandra Scadova acknowledged that she had consented to a search of the apartment and, in fact, signed a form confirming her consent. She then told him and Chief Southwell where to find the shotgun and the cash drawer they were looking for.

The defendant first contends on this appeal that the five hundred dollars found in his boot, the shotgun, and the cash drawer were all products of illegal searches and seizures and should have been suppressed.

He claims that the search of his person that was conducted after he took the breathalyzer test was illegal because, once the results of that test were known, Chief Southwell no longer believed he had probable cause to hold the defendant and intended to release him.

Our review of the record, with particular reference to those portions of the transcript relied upon by the defendant, indicates that the defendant has taken some license in his interpretation of Chief Southwell's testimony. The transcript reads:

"Defense Attorney: As I understood, you indicated as soon as that test was given it was your opinion then that he was not under the influence, is that correct?

Chief Southwell: From the results of the test, .04, I drew the conclusion he was not DWI.

> Defense Attorney: And you did not intend to prosecute him for it?
>
> Chief Southwell: *I had not reached that decision.*
>
> Defense Attorney: You had come to the conclusion that he was not under the influence, but you had not come to the . . . .
>
> Chief Southwell: I came to the conclusion he was not under the influence of alcohol, *but his movements for tests and everything like that there was something that wasn't normal.* (Emphasis added.)
>
> Prosecutor: What do you mean when you said under the influence of something else?
>
> Chief Southwell: I thought he was under the influence of drugs."

■ It is apparent that these are not the words of a police officer who is about to release a person he has arrested and drop charges of violating RSA 262-A:62 (Supp. 1979). This is especially true where, as here, the defendant had previously stated he had taken both *drugs* and alcohol prior to his arrest, and where RSA 262-A:62 (Supp. 1979) prohibits the operation of a motor vehicle "while under the influence of intoxicating liquor or any controlled *drug*. . . ." (Emphasis added.) Under these circumstances, the defendant's reliance upon the breathalyzer test results is misplaced because the defendant's admission and physical behavior themselves constituted probable cause to continue holding him for a violation of RSA 262-A:62 (Supp. 1979). It is clear that, at the time of the search, no decision had been made to release the defendant and that he was still being held under a valid arrest. Accordingly, the pat-down search and the seizure of five hundred dollars from his boot did not violate the defendant's fourth amendment rights under the Federal constitution, *United States v. Edwards*, 415 U.S. 800, 802–03 (1974), or the rights afforded to him under our own State constitution. *State v. Maxfield*, 121 N.H. 103, 105, 427 A.2d 12, 14 (1981).

The defendant next alleges that the State failed to prove that Sandra Scadova freely, knowingly and voluntarily gave her consent to have the apartment searched. No allegation is made that she lacked the requisite authority to give such consent.

■ "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is *a question of fact* to be determined from the totality of all the circumstances." (Emphasis added.) *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Our concern, therefore, is whether the record supports such a finding.

■ Sandra Scadova offered no testimony on this issue at the suppression hearing. Chief Southwell did testify concerning the facts attending Ms. Scadova's consent to the search. His testimony indicates that when he and Lieutenant Fish arrived at her apartment, they advised her that the defendant was in custody and asked her about a shotgun and a cash drawer. They next asked permission to search the apartment, but she refused. Lieutenant Fish left the apartment in order to obtain a search warrant, and Chief Southwell remained. After conversing with the Chief, Ms. Scadova consented to the search, signed a consent form and went so far as to show the police officers where the cash drawer was hidden because she felt "they would never find it." This indicates more than consent; it evinces complete cooperation. We hold that there was ample evidence to support a finding that she freely, knowingly and intelligently consented to the search.

■ ■ The defendant next argues that the statement he made to Lieutenant Fish that he was home all night during the night of the Sunoco station robbery-murder should have been suppressed. He is correct that in *Gullick* we instructed our trial courts to "enter an express finding that the waiver [of rights] (and any confession) was voluntary beyond a reasonable doubt." *State v. Gullick*, 118 N.H. 912, 915, 396 A.2d 554, 556 (1978). This requirement, however, is one of procedural convenience and does not vest substantive rights in the defendant. Rather, it is a procedural requirement that we have imposed to insure that records on appeal before us disclose that the trial court has applied the proper standard of proof in determining "voluntariness." *See State v. Phinney*, 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977). The requirement serves to facilitate our review of such cases, because in this area of special concern we will not, when faced with a silent record, presume that the trial court applied the proper test.

It is true that neither of the two judges who ruled on the admissibility of the defendant's utterance, one at a pretrial suppression hearing and one at trial, made express findings on the record as required by *Gullick*. Unlike *Gullick*, however, the record in this case is not silent with respect to the trial court's awareness of the fact that, in making its decision whether or not the defendant's

utterance was admissible, it must employ the reasonable doubt standard. Specifically, at the motions hearing before *King*, J., held on September 11, 1979, the following dialogue took place between the court and counsel.

"Mr. McNamara: Before counsel in Radziewicz leave, there is one matter I wanted to bring to the Court's attention while the Court still has the file. I read in the motions, the motion to suppress that was denied (referring to a motion heard by the Court on August 24 and 29, 1979), the motion of the defendant Charles Radziewicz to suppress and exclude evidence of statements given to the police by the defendant was denied by the Court, but the Court did not state the burden of proof it used in its finding. Under *State v. Gullick* in 118 New Hampshire, confessions are only admissible if the Court finds beyond a reasonable doubt that the statement was voluntarily made. For that reason, Your Honor, I would request that the Court clarify its ruling on the motion to suppress in Radziewicz as to whether or not the finding was made beyond a reasonable doubt . . . .

The Court: I will clarify it.

Mr. McNamara: Thank you, Your Honor."

Similarly, at trial, after defense counsel's voir dire of Lieutenant Fish and just prior to making its ruling on the admissibility of the challenged statement, the trial judge asked counsel:

"The Court: In this *Miranda* warning do you understand it had to be a written statement and signed? Isn't that merely for the purpose of record as long as it's been established beyond a reasonable doubt that a *Miranda* warning was in fact given?"

The foregoing convinces us that the judges who ruled on the admissibility of the statement in question were aware of what the proper standard of proof was.

Moreover, our own review of the record satisfies us that there was more than sufficient evidence to support the trial court's decision to allow the defendant's utterance into evidence. The defendant had signed a written waiver form a half-hour before the statements were made, *see North Carolina v. Butler*, 441 U.S. 369, 373 (1979), and prior to questioning him, Lieutenant Fish advised him that a homicide was involved. There is no indication that the defendant was reluctant to talk, and the statement he made was not incriminating, but it did disagree with what another witness testified to concerning his whereabouts on the night in question. In summary, we hold that a review of the record and evidence in the instant case supports a finding that both the defendant's waiver of his *Miranda* rights and his statement to Lieutenant Fish were voluntary beyond a reasonable doubt. It would, of course, have made it unnecessary for us to consider this aspect of the issue if the trial court had explicitly complied with *Gullick*.

The defendant's final argument is that the presence of a rifle that was mistakenly placed in the jury's view constituted grounds for a mistrial. We disagree.

■ A review of the record indicates that the rifle was in the jury's sight for about ten minutes. Once it was noticed by defense counsel, he called it to the court's attention, the jury was excused and the defendant moved for a mistrial on the ground that the rifle's presence prejudiced the jury. The court denied the motion but asked if the defense wanted to have the jury polled in order to determine whether they in fact did observe the rifle, or if the defense wished the court to instruct the jury that the rifle had nothing to do with the case. Both alternatives were rejected by the defense. The rifle was removed from the courtroom, the jury was brought back in, and the trial continued without any comments ever being made about the rifle in the jury's presence.

The record also shows that a shotgun was properly admitted into evidence and that the defendant, in direct response to questions asked by his own attorney on direct examination, testified that he owned a .22 caliber rifle, a shotgun and a .32 caliber handgun. Under these circumstances, the argument that the fact that the rifle was placed in view of the jury was prejudicial is meritless.

Accordingly, the order is

*Affirmed.*

KING, C.J., and BATCHELDER, J., did not sit; the others concurred.