THE STATE OF NEW HAMPSHIRE

v.

DAVID CAPLIN

June 5, 1991

*John P. Arnold,* attorney general (*Paul A. Maggiotto,* assistant attorney general, and *Tina L. Nadeau,* attorney, on the brief and orally), for the State.

*Ray Raimo* and *Sean P. Gill*, of Manchester (*Mr. Raimo* and *Mr. Gill* on the brief, and *Mr. Raimo* orally), for the defendant.

BROCK, C.J. The State brings this interlocutory appeal pursuant to RSA 606:10 from rulings of the Superior Court (*Groff*, J.) prior to the trial of the defendant, David Caplin, on two counts of first degree murder. The defendant filed pretrial motions (1) to suppress evidence of hair samples found at the scene of the crime and (2) to suppress the defendant's prior testimony at a so-called *Richards* hearing held during the trial of Anthony Barnaby, *see State v. Richards*, 129 N.H. 669, 531 A.2d 338 (1987). The court granted both motions.

On appeal, the State asserts that the trial court: (1) applied an erroneous legal standard for the admission of expert testimony concerning the hair samples; (2) made erroneous findings of fact regarding the expert witness's testimony; (3) erroneously concluded that the expert testimony was irrelevant; (4) erroneously concluded that even if relevant, the evidence was unfairly prejudicial to the defendant; (5) erred in requiring the State to prove a knowing, voluntary and intelligent waiver of the defendant's fifth amendment privilege before admitting his *Richards* hearing testimony; and (6) erred in concluding that the defendant's testimony at the *Richards* hearing was compelled. For reasons that follow, we affirm the trial court's rulings on the motions.

The relevant facts are as follows. On the morning of October 3, 1988, the bodies of Brenda Warner and Charlene Ranstrom were discovered in the bedroom of their Nashua apartment. According to the State medical examiner, the two women died as a result of multiple stab wounds. Upon reaching the crime scene, police officers secured the site and gathered any physical evidence which might have been left by the perpetrator(s).

Among trace evidence recovered from the crime site were seven pubic hair follicles, which were subsequently sent to the laboratory of the Federal Bureau of Investigation in Washington, D.C. Special Agent Deedrick, an 18-year veteran of the Bureau's hair and fiber unit, was assigned to conduct an analysis of the seven hair samples. Agent Deedrick had extensive experience in hair analysis, having previously performed approximately 4,000 analyses. Microscopic examination of the questioned hairs led him to believe that all seven probably came from the same person. Agent Deedrick thereafter compared these hairs with known samples retrieved from each of the two victims, the defendant, and another suspect, Anthony Barnaby.

In his report, Deedrick stated that he could reach no conclusion as to the origin of the seven questioned hairs.

The State brought Anthony Barnaby to trial three times for the two murders, alleging that he acted in concert with Caplin in committing the crimes. Agent Deedrick was called as a witness at each of Barnaby's trials and testified that the most significant difference between Caplin's hairs and the questioned hairs involved the tip of the hair follicles. Microscopic examination revealed that all seven of the hairs recovered from the crime scene had scissor-cut tips, while each of the samples taken from Caplin exhibited a naturally tapered tip. Deedrick further explained that if the questioned hairs had come from Caplin, and if Caplin's pubic hairs exhibited cut tips at the time the crimes were committed, he might or might not find cut tips among the sample of pubic hairs taken from the defendant four months later. Both the State and defense counsel questioned Agent Deedrick extensively in an effort to elicit his opinion as to whether Caplin could have been the source of the seven hairs. Agent Deedrick steadfastly refused to render such an opinion, and testified that it was impossible for him to say whether or not the hairs came from Caplin.

Prior to his trial, Caplin filed a motion *in limine* seeking to exclude all evidence pertaining to the hairs found at the crime scene. In support of his motion, the defendant contended that Agent Deedrick's analysis was inconclusive as to the source of the crime scene hairs, that distinct differences existed between the crime scene hairs and samples obtained from the defendant, and that the hair sample evidence was unfairly prejudicial to the defendant.

The Superior Court (*Groff,* J.) granted the motion, concluding that the evidence of the characteristics of the defendant's pubic hair was not relevant and, that even if relevant, the evidence was so unfairly prejudicial to the defendant as to outweigh its probative value.

Prior to the first Barnaby trial, Anthony Barnaby informed the court of his intent to call Caplin as a witness. In order to address Caplin's fifth amendment privilege, the Superior Court (*Dalianis,* J.) conducted a hearing pursuant to *State v. Richards,* 129 N.H. 669, 531 A.2d 338. At the outset, the court explained the purpose of the hearing, and pointed out that Caplin's newly appointed attorney was present to assist him with respect to asserting his fifth amendment rights.

During the hearing, Barnaby's attorney questioned Caplin about his whereabouts on the night of the murders. The defendant responded to some questions, but many times, after conferring with

counsel, asserted his privilege against self-incrimination. The superior court ordered the defendant to answer certain questions, notwithstanding his assertion of his fifth amendment privilege.

At the conclusion of Caplin's testimony, his attorney advised the court that she had misunderstood the *Richards* hearing process in thinking that Caplin should first answer questions, whereupon the court would rule on whether he was permitted to assert his fifth amendment right. Because of this misunderstanding, she believed that she did not advise the defendant to assert the privilege when she should have. Counsel acknowledged her error, and the court ordered the transcript "impounded" after the trial so that there would be no "irremediable" damage to Caplin.

The day after the *Richards* hearing, new counsel appointed for Caplin asserted Caplin's privilege against self-incrimination as to any testimony beyond name, date of birth, and present residence address in jail. Barnaby's attorney was then permitted to read the transcript of the *Richards* hearing to the jury. The transcripts were then collected and sealed.

Now, at Caplin's trial, the State seeks to introduce against Caplin the portions of the *Richards* hearing testimony that he gave without first asserting his fifth amendment privilege. The defendant filed a motion *in limine*, grounded in his State and federal constitutional rights, seeking to suppress all of his testimony at the *Richards* hearing.

The Superior Court (*Groff*, J.) granted the motion, concluding that the defendant's *Richards* hearing testimony was involuntary and the product of compulsion.

## I. *Expert Testimony—Hair Sample Analysis*

We first address the State's claim on appeal that the trial court erroneously concluded that the hair sample evidence was irrelevant and improperly excluded it. The State relies upon the cases of *State v. Scarlett*, 121 N.H. 37, 41, 426 A.2d 25, 28 (1981); *State v. Staples*, 120 N.H. 278, 281, 415 A.2d 320, 322 (1980); and *State v. Farrow*, 118 N.H. 296, 307, 386 A.2d 808, 815 (1978), in arguing that the trial court applied an erroneous standard for determining the admissibility of the testimony, requiring that Agent Deedrick must be able to identify a particular person as the source of the crime scene hairs. The State contends that the trial court erroneously concluded that the expert could form no opinion as to the identity of the hairs. The State also argues that the trial court erroneously concluded that, even if the evidence were considered relevant, it was unfairly prejudicial to the defendant.

■■ The determination of whether evidence is relevant is within the sound discretion of the trial court, and we will not reverse its determination absent evidence of abuse of that discretion. *State v. Roberts*, 131 N.H. 512, 521, 556 A.2d 302, 308 (1989). "Opinion evidence is admissible if the court finds that the expert is qualified to give an opinion on the issue raised and that it will aid the jury." *State v. Staples supra; see* N.H. R. Ev. 702. New Hampshire Rule of Evidence 402 requires the exclusion of irrelevant evidence. New Hampshire Evidence Rule 401 states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401.

The record reveals that at Barnaby's trial, Agent Deedrick testified concerning the similarities and dissimilarities between the hair samples found at the crime scene and those obtained from Caplin. Deedrick testified that all of the hairs found at the crime scene probably came from the same person. However, the significant dissimilarity of the cut hair follicle tips resulted in his inability to form an opinion as to whether Caplin was the source of the crime scene hairs.

"Attorney Maggiotto:

Q. *I guess the question becomes, though, can you tell this jury whether or not in your opinion those hairs are the hairs of David Caplin?*

Agent Deedrick:

A. *My conclusion is no conclusion. It is the gray area between could have and could not have.*

. . .

Q. And I guess what's troubling or what's left up in the air is your opinion as to whether or not you can say these are David Caplin's pubic hairs.

A. And I can't say. . . . There are three conclusions that can be reached. Either they are alike in all respects and could have come from the person, which isn't positive.

Q. That's the best conclusion you can get?

A. Well, that's a good conclusion, yes. If you can do that, you have got a good association.

Q. Okay.

A. On the other hand, you may have two hairs that are—hair that is distinctly different than the known standard. They could not have come from that person.

In a situation where you have hairs that are very similar microscopically but something—some nagging little thing there that doesn't quite look right microscopically which could be a cut tip, could be a pigment granule out of place or something there that bothers me as an examiner, I don't include the hair but I don't throw it out. I just don't go as strong with it. I have to be pretty darn certain that all the characteristics of the questioned hair and the known hair are alike or I won't say this person could have been there.

Q. And which category do these hairs fall into, this last—

A. That's one of those, and I can't eliminate them but I can't say it's his."

(Emphasis added.)

Agent Deedrick evaluated the hair samples and was unable to form an opinion as to their source. To allow admission of his testimony would be improperly to require the jury to assume the role of the expert and to evaluate the technical data. Since this is clearly beyond the jury's ability, the testimony would be of little value.

We are not persuaded by the State's argument that the evidence is relevant under *State v. Farrow*, 118 N.H. at 307, 386 A.2d at 815 and *State v. Scarlett*, 121 N.H. at 41, 426 A.2d at 28. In both *Farrow* and *Scarlett*, the expert witness testified that the hair samples at issue were similar in all fifteen recognized microscopic characteristics. In the case before us, Deedrick observed a significant dissimilarity between the hair samples which prevented him from reaching a conclusion as to their source.

 We find no error in the trial court's conclusion that the testimony was not relevant and find no abuse in the exercise of its discre-

tion to prevent admission of the testimony at the defendant's trial. It follows that we do not need to consider the State's argument that the trial court improperly concluded that the evidence was unfairly prejudicial.

## II. *Richards Hearing Testimony*

■ Next, we consider the trial court's ruling suppressing the defendant's *Richards* hearing testimony. We will not overturn the ruling, absent an abuse of discretion. *State v. Steer*, 128 N.H. 490, 492, 517 A.2d 797, 799 (1986); *State v. Brooks*, 126 N.H. 618, 621–22, 495 A.2d 1258, 1263 (1985).

The State sought to introduce at trial the answers to only those questions where Caplin failed to invoke his privilege. On appeal, the State argues that the trial court improperly relied on *State v. Phinney*, 117 N.H. 145, 370 A.2d 1153 (1977), in requiring the State to prove a voluntary waiver before introducing the defendant's *Richards* hearing testimony. The State also asserts that the trial court improperly concluded that the defendant's testimony was compelled.

■ "The privilege against self-incrimination as set forth in the State and National Constitutions may not be applied by the court to create an all-inclusive immunization from giving testimony." *State v. Richards*, 129 N.H. at 673, 531 A.2d at 341. Rather, the court will determine during a *Richards* hearing whether to compel a witness to testify, after balancing the witness's right to be free from self-incrimination with the right of the accused to produce exculpatory evidence. *Id.* (citation omitted).

Caplin was a suspect, not yet indicted for the murders, at the time he was subpoenaed and testified at the *Richards* hearing. Ostensibly, counsel for Barnaby offered Caplin's testimony in an effort to incriminate Caplin and exonerate Barnaby, and the trial court held the *Richards* hearing in order to determine the scope of defendant's fifth amendment privilege.

"The Court: Now, we have convened in camera here without the jury in order to conduct a so-called Richard's [sic] hearing during which the proponent of the witness—that is, the defense—will ask questions and an independent determination will be made as to each question relative to whether it should be answered in

front of the jury or not. The obvious implications here relate to the witness' Fifth Amendment rights against possible self-incrimination.

His counsel, Attorney Amadeo-Vickery, is present and will consult with him as to any question about which he has a concern or she has a concern. We recognize that she is newly appointed to represent the witness and may be at somewhat of a disadvantage in that regard. However, it will be the court which determines whether questions will ultimately be answered or not. And counsel's concerns are sufficiently on the record, I think, to protect the interests that there may be in that area."

At the conclusion of the hearing, Caplin's counsel admitted on the record that she had apparently misunderstood the *Richards* hearing process, in thinking that the court itself would make an independent determination as to which questions would be answered and what evidence was incriminating, and in thinking that the defendant would not be forced to incriminate himself. It is apparent that the court's explanation of the *Richards* hearing contributed to this misunderstanding. As a result, counsel failed to advise Caplin to invoke his fifth amendment privilege in response to certain questions. We conclude, under these circumstances, that the answers to those questions were as much coerced as if Caplin had properly invoked his privilege and then was compelled by the court to answer.

In reviewing the record that the trial court had before it, we find no abuse of discretion or error by the trial court in its decision to suppress the *Richards* hearing testimony. Since we decide the case on this basis, we need not reach the question of whether defendant effectively waived his fifth amendment privilege.

*Affirmed.*

All concurred.